718

[Nos. 44635-5-I; 44938-9-I; Division One. April 9, 2001.]
45506-1-I; 45181-2-I;
44939-7-I; 45719-5-I.

*In the Matter of the Detention of* C.W., *Respondent,* THE STATE OF WASHINGTON, *Appellant.*
*In the Matter of the Detention of* B.B., *Respondent,* THE STATE OF WASHINGTON, *Appellant.*
*In the Matter of the Detention of* E.S., *Respondent,* THE STATE OF WASHINGTON, *Appellant.*
*In the Matter of the Detention of* D.M., *Respondent,* THE STATE OF WASHINGTON, *Appellant.*
*In the Matter of the Detention of* T.B., *Respondent,* THE STATE OF WASHINGTON, *Appellant.*
*In the Matter of the Detention of* R.F., *Respondent,* THE STATE OF WASHINGTON, *Appellant.*

720

*Norm Maleng, Prosecuting Attorney,* and *Gerald A. Smith* and *Katharine B. Wilcox, Deputies,* for appellant.

*Richard Lichtenstadter* (of *The Defender Association*), for respondents.

Cox, J. — At issue in these consolidated appeals is the timeliness of detention of each respondent by the county designated mental health professional (CDMHP) after notice by the hospitals' emergency room staff pursuant to RCW 71.05.050 that each respondent needed to be further evaluated for mental illness. Each respondent also challenges, on due process grounds, the constitutionality of that statute. We hold that the six-hour period specified in RCW 71.05.050 begins to run at the time the professional staff of the emergency room of a "public or private agency or hospital" *determines* that an evaluation by the CDMHP is necessary. We further hold that RCW 71.05.050 satisfies the due process challenge made here, provided that the State meets its burden to justify, by a preponderance of the evidence, any delay between a person's arrival at an emergency room and the determination by professional staff that it is necessary to notify the CDMHP to take action. Accordingly, we reverse the orders of dismissal as to R.F., C.W., B.B., and T.B. We vacate the orders of dismissal as to D.M. and E.S.

The facts are largely undisputed. All respondents were initially brought to the emergency rooms (ER) of either Harborview Medical Center (HMC) or Valley Medical Center for observation and/or treatment. Because no one contests the point, we presume each respondent refused voluntary admission to the hospital. At various times following arrival at the ER, the professional staff evaluated the respondents. The staff then made individualized determinations that each had a mental disorder with either "immi-

nent likelihood of serious harm" or "imminent danger because of grave disability," as RCW 71.05.050 provides. Accordingly, the staff detained each respondent and notified the CDMHP of the need for further evaluation. At various times following notice, the CDMHP took the respondents into custody.

Each detained person was then hospitalized. Prior to the expiration of the 72-hour period prescribed by RCW 71.05.150(2),[1] the CDMHP petitioned the superior court for 14-day involuntary treatment. At the hearings on the petitions, the detained persons moved to dismiss the petitions. They all asserted that the hospitals' professional staff exceeded the six-hour detention period mandated by RCW 71.05.050. They also argued that RCW 71.05.050 is unconstitutional because it fails to provide due process protection.

Mental health court commissioners granted all motions. The State moved for revision of one of the orders, and a superior court judge denied that motion.

The State appeals.

## Mootness

■■ Although neither party raises this issue, these cases are technically moot. The persons detained pursuant to RCW 71.05.050 were all released by virtue of the orders now on appeal. Thus, the relief that the State seeks would come too late.[2] But we may decide a moot case if it involves matters of continuing and substantial public interest.[3]

---

[1] RCW 71.05.150(2) states that:

When a county designated mental health professional receives information alleging that a person, as the result of a mental disorder, presents an imminent likelihood of serious harm, or is in imminent danger because of being gravely disabled ... the county designated mental health professional may take such person ... into emergency custody in an evaluation and treatment facility for not more than seventy-two hours. ...

[2] *In re Det. of G.V.*, 124 Wn.2d 288, 294, 877 P.2d 680 (1994).

[3] *In re Det. of Swanson*, 115 Wn.2d 21, 24, 793 P.2d 962, 804 P.2d 1 (1990); *In re Det. of G.V.*, 124 Wn.2d at 294.

Our Supreme Court has previously held that " 'the need to clarify the statutory scheme governing civil commitment is a matter of continuing and substantial public interest.' "[4] Moreover, the frequency of 72-hour evaluation and treatment detention proceedings indicates that these issues are likely to recur. Accordingly, we proceed to address the merits of these cases.

## Commencement of Detention

▪▪▪ The State argues that the plain meaning of the second proviso of RCW 71.05.050 dictates that the six-hour period of detention commences when the professional staff at an ER makes the determination that a person meeting the requirements of the statute should be evaluated by the CDMHP. We agree.

We construe statutes as a whole to give effect to all the language and to harmonize all provisions.[5] Where a statute is ambiguous, we construe it to give effect to the legislative intent.[6] We strictly construe civil commitment statutes because they involve deprivation of liberty.[7] The construction of a statute is a question of law that we review de novo.[8]

We are concerned here with the application of RCW 71.05.050 to the facts of each consolidated case now before us. The statute provides:

> Nothing in this chapter shall be construed to limit the right of any person to apply voluntarily to any public or private agency or practitioner for treatment of a mental disorder, either by direct application or by referral. Any person voluntarily admitted for inpatient treatment to any public or private agency

---

[4] *In re Det. of G.V.*, 124 Wn.2d at 294 (quoting *In re Det. of LaBelle*, 107 Wn.2d 196, 200, 728 P.2d 138 (1986)).

[5] *City of Seattle v. Fontanilla*, 128 Wn.2d 492, 498, 909 P.2d 1294 (1996).

[6] *Health Ins. Pool v. Health Care Auth.*, 129 Wn.2d 504, 508, 919 P.2d 62 (1996).

[7] *In re Det. of Swanson*, 115 Wn.2d at 27.

[8] *Rettkowski v. Dep't of Ecology*, 128 Wn.2d 508, 515, 910 P.2d 462 (1996).

*shall be released immediately upon his or her request. . . . PROVIDED FURTHER, That if a person is brought to the emergency room of a public or private agency or hospital for observation or treatment, the person refuses voluntary admission, and the professional staff[9] of the public or private agency or hospital regard such person as presenting as a result of a mental disorder an imminent likelihood of serious harm,[10] or as presenting an imminent danger because of grave disability,[11] they may detain such person for sufficient time to notify the [CDMHP] of such person's condition to enable the [CDMHP] to authorize such person being further held in custody or transported to an evaluation treatment center pursuant to the conditions in this chapter, but which time shall be no more than six hours from the time the professional staff determine that an evaluation by the [CDMHP] is necessary.[12]*

The second proviso of the above statute is at issue here. It sets forth the criteria by which an ER professional of a hospital or agency may temporarily detain a person for further evaluation by the CDMHP. The proviso prescribes the three general statutory requirements for an ER profes-

---

[9] RCW 71.05.020(19) (1998) defines "professional person" as "a mental health professional and shall also mean a physician, registered nurse, and such others as may be defined by rules adopted by the secretary pursuant to the provisions of this chapter[.]"

[10] RCW 71.05.020(14) (1998) defines "likelihood of serious harm" as:

(a) A substantial risk that: (i) Physical harm will be inflicted by an individual upon his or her own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on oneself; (ii) physical harm will be inflicted by an individual upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm; or (iii) physical harm will be inflicted by an individual upon the property of others, as evidenced by behavior which has caused substantial loss or damage to the property of others; or

(b) The individual has threatened the physical safety of another and has a history of one or more violent acts[.]

[11] RCW 71.05.020(9) (1998) defines "gravely disabled" as:

[A] condition in which a person, as a result of a mental disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health and safety[.]

[12] (Emphasis added.)

sional to detain a person for further evaluation by the CDMHP. First, the person must be brought to an ER of a hospital or "agency" for observation or treatment. Second, the person must refuse voluntary admission. Third, the "professional staff" must *regard*" such person as fulfilling either or both of the statutory criteria. They are that the person suffers from a "mental disorder" that presents either an imminent "likelihood of serious harm" or an imminent danger because of "grave disability." Once all criteria are met, the professional staff may then detain such person and notify the CDMHP of its need to act. The proviso then goes on to specify a six-hour time limit within which the CDMHP may authorize that the detained person be either further held in custody or transported to an "evaluation treatment center."[13]

The parties do not directly address the interrelationship of the timing of the various stages described in the proviso. We read the proviso to mean that the time that professional staff "regards" that the person in the ER fulfills the statutory criteria is generally the same time as when staff "determines" that CDMHP evaluation of such person is necessary. This interpretation most logically harmonizes the wording of the clauses describing when staff regards the person to have met the statutory criteria with the clause describing when staff determines that it is necessary for the CDMHP to conduct an evaluation. This reading is also most consistent with the legislative intent to provide prompt

---

[13] RCW 71.05.020(8) (1998) defines "evaluation and treatment facility" as:

[A]ny facility which can provide directly, or by direct arrangement with other public or private agencies, emergency evaluation and treatment, outpatient care, and timely and appropriate inpatient care to persons suffering from a mental disorder, and which is certified as such by the department. A physically separate and separately operated portion of a state hospital may be designated as an evaluation and treatment facility. A facility which is part of, or operated by, the department or any federal agency will not require certification. No correctional institution or facility, or jail, shall be an evaluation and treatment facility within the meaning of this chapter[.]

Although there is a slight variation between "center" in this portion of the statute and "facility" in the definitional section, we regard the variation as insignificant for purposes of our analysis.

evaluation and treatment, consistent with the safeguarding of individual rights.[14] Likewise, it is most consistent with the legislative directive to:

[E]nhance continuity of care for persons with serious mental disorders that can be controlled or stabilized in a less restrictive alternative commitment . . . encourage appropriate interventions at a point when there is the best opportunity to restore the person to or maintain satisfactory functioning.[15]

The last clause of the proviso is most directly at issue here. It specifies that the six-hour time limit begins when professional staff "*determines*" that it is necessary for the CDMHP to evaluate the detained person. The issue we must decide is when professional staff makes such a determination. The State contends that this occurs only after professional staff at an ER screens, evaluates, and concludes that a patient meets the statutory criteria. The persons who were detained below respond that, for various reasons, the determinations in these cases were at earlier times. We agree with the State.

The statute does not define "determination" or describe when it occurs. But construing the "determination" for CDMHP referral to begin only after professional staff at an ER screens, evaluates, and concludes that a patient meets the statutory criteria is most reasonable. First, the statutory criteria forming the basis for CDMHP referral cannot be readily ascertained without an evaluation. Second, our reading most strongly furthers the legislative intent to prevent inappropriate commitment and to provide prompt evaluation and appropriate treatment of persons with serious mental disorders of the type specified in the statute. Concluding that either of the statutory criteria of "imminent likelihood of serious harm" or "imminent danger because of grave disability" is met prior to an evaluation by professional staff at an ER would be guesswork, at best.

---

[14] RCW 71.05.010(2), (3).

[15] RCW 71.05.012.

Accordingly, we hold that the six-hour period specified in RCW 71.05.050 begins when the professional staff of a hospital or agency determines that a person brought to the ER fulfills the statutory criteria and that it is necessary for the CDMHP to evaluate that person.

Respondents argue that the determination for CDMHP referral, and hence the beginning of the six-hour period, begins as soon as one is either restrained at an ER or no longer requires medical treatment. We disagree.

This construction conflicts with the plain words of the statute. It also leads to absurd results. If the six-hour period begins to run as soon as one is restrained or no longer requires medical treatment, ER professionals' ability to accurately evaluate a person's mental status to determine whether the statutory criteria have been met is compromised. Emergency room professionals must prioritize the needs of the flow of patients that arrive and devote their resources first to those with life-threatening conditions. Under the respondents' construction, patients that might otherwise qualify for CDMHP referral must be released simply because six hours has elapsed from the time they are either restrained or no longer require medical attention, even if professional staff was preoccupied treating patients with higher medical and/or mental priorities. For these reasons, we decline to adopt the respondents' construction that RCW 71.05.050's six-hour period begins as soon as a person is restrained or no longer requires medical treatment.[16]

## Due Process

The above interpretation of the statute does not end our inquiry. Respondents argue that to hold that the six-hour period begins only when professional staff evaluates a

---

[16] *In re Det. of A.S.*, 91 Wn. App. 146, 158, 955 P.2d 836 (1998), *aff'd*, 138 Wn.2d 898, 982 P.2d 1156 (1999) ("the spirit and intent of the [civil commitment statutes] should prevail over the letter of the law so as to avoid strained or absurd consequences").

patient and determines to refer the patient to CDMHP violates due process. Specifically, they claim that such a construction permits ER professional staff to indefinitely detain individuals who may or may not qualify for referral to the CDMHP.

In response, the State points out that respondents fail to cite any case authority that requires specific time limits for an ER professional to screen and stabilize a patient. Based on this observation, the State appears to take the position that we should not consider respondents' constitutional challenge.

Neither position articulated by the parties is entirely sound.

 "It is a well-established general rule that where the constitutionality of a statute is challenged, that statute is presumed constitutional and the burden is on the party challenging the statute to prove its unconstitutionality beyond a reasonable doubt. This 'demanding standard of review' is justified because, as a coequal branch of government that is sworn to uphold the constitution, we assume the Legislature considered the constitutionality of its enactments and afford great deference to its judgment. 'Additionally, the Legislature speaks for the people and we are hesitant to strike a duly enacted statute unless fully convinced . . . that the statute violates the constitution.' "[17]

 Involuntary commitment for mental disorders constitutes a significant deprivation of liberty that requires due process protection.[18] As such, statutes involving a deprivation of liberty are construed strictly.[19] Where a statute is susceptible to an interpretation that may render it unconstitutional, we adopt a construction that will sus-

---

[17] *Tunstall ex rel. Tunstall v. Bergeson*, 141 Wn.2d 201, 220, 5 P.3d 691 (2000) (citations omitted), *cert. denied*, 121 S. Ct. 1356 (2001).

[18] *Addington v. Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979); *In re Harris*, 98 Wn.2d 276, 279, 654 P.2d 109 (1982).

[19] *In re Det. of Swanson*, 115 Wn.2d at 27.

tain the statute's constitutionality.[20]

Here, RCW 71.05.050 does not specify any maximum time that an ER may take from the time a patient arrives at the ER to the time professional staff makes its determination whether or not that patient meets the statutory criteria for CDMHP referral. This is in marked contrast to the six-hour time limit specified for the CDMHP to act once an ER makes a referral.

The record before us is unclear as to whether all respondents arriving at the ERs were detained. It is equally unclear whether any respondent asked to leave the ER. Whether or not a person entering an ER is "detained" or requests to leave an ER are threshold questions that must be decided on the basis of the facts of individual cases.

For purposes of our analysis of the cases now before us, we assume that all respondents asked to leave the ER and were detained for various periods of time before professional staff evaluated them and determined that each met the statutory criteria for referral to the CDMHP. In light of this curtailment of liberty, the right to due process requires the intervention of an impartial third party to ensure that procedural requirements have been met.[21]

In *In re Detention of LaBelle*,[22] our Supreme Court considered the constitutional adequacy of certain aspects of the commitment procedures specified in chapter 71.05 RCW. There, persons initially committed for 72 hours as "gravely disabled" challenged, on due process grounds, the procedures for committing them for an additional 14 days.[23]

In addressing their concerns, the court first stated

---

[20] *In re Det. of Chorney*, 64 Wn. App. 469, 477, 825 P.2d 330 (1992) (citing *In re Cross*, 99 Wn.2d 373, 382-83, 662 P.2d 828 (1983)).

[21] *Cf. In re Harris*, 98 Wn.2d at 287-88 (holding that the potential curtailment of liberty requires the intervention of the courts, as a function of their inherent judicial power, to ensure that a finding of "probable dangerousness" exists before a mental health professional may summon a person to a 72-hour evaluation and treatment period under former RCW 71.05.150); *In re Det. of Chorney*, 64 Wn. App. at 477.

[22] 107 Wn.2d 196, 728 P.2d 138 (1986).

[23] *In re Det. of LaBelle*, 107 Wn.2d at 199-201.

the test for reviewing the constitutional adequacy of involuntary commitment procedures as one of balancing several factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or [substitute] procedural requirement would entail.[24]

■■■■ The court recognized that the private interests affected by the 14-day commitment proceedings were the deprivation of liberty as well as the adverse social consequences to the individual.[25] But the court also recognized the State's countervailing legitimate interest, under its police and parens patriae powers, to protect the community against dangerously disturbed individuals and to provide care to its citizens who are unable to care for themselves because of mental illness.[26]

Having first balanced the first and the last of the controlling factors, the court then addressed whether the additional safeguard, in the form of a higher standard of proof at the 14-day hearing, was required. The court concluded that the standard of proof of preponderance of the evidence, as opposed to the higher "clear, cogent, and convincing" standard, was appropriate. Among the reasons that the court considered in reaching its conclusion was that prompt judicial review at the probable cause hearing tested the adequacy of the State's grounds for detention.[27] Thus, there were protections to safeguard the individual's private interests. Also, a higher standard of proof would have imposed

---

[24] *In re Det. of LaBelle*, 107 Wn.2d at 221 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)).

[25] *In re Det. of LaBelle*, 107 Wn.2d at 221.

[26] *In re Det. of LaBelle*, 107 Wn.2d at 221.

[27] *In re Det. of LaBelle*, 107 Wn.2d at 222-23.

an unreasonable procedural burden for the State to gather and present the necessary evidence for a relatively short-term commitment.[28]

The same principles guide our analysis and conclusions here. As in *In re Detention of LaBelle*, the same private interests are at stake here. Similarly, the State has a legitimate interest, under its police and parens patriae powers, in promptly determining whether or not persons arriving at an ER may have mental disorders that fulfill the statutory criteria of RCW 71.05.050. Thus, the question is whether additional safeguards are required to ensure that the statute passes constitutional muster.

■■■ In order to comport with due process, we construe RCW 71.05.050 to require the State to prove by a preponderance of the evidence that any delay between a person's arrival at an ER and detention and the professional staffs' determination to refer to the CDMHP is justified. The State has the burden of proving probable cause to commit a person by a preponderance of the evidence in the initial 14-day commitment proceedings.[29] Largely for the reasons stated in *In re Detention of LaBelle*,[30] we hold that the State must meet the same evidentiary standard for any predetermination detention at an ER.

In making that showing, the State may argue, without limitation, such factors as priorities set by the ER with respect to the order of care and treatment of its patients; the time necessary to screen and stabilize a patient; the time that it takes to conduct a thorough evaluation of a patient for possible referral to the CDMHP; the relative difficulty of evaluating the patient for possible referral to the CDMHP; whether the patient requires immediate medical care; and whether that person requires additional services such as an interpreter. In view of these factors, and

---

[28] *In re Det. of LaBelle*, 107 Wn.2d at 222.

[29] RCW 71.05.240; *In re Det. of LaBelle*, 107 Wn.2d at 220; *In re Det. of Chorney*, 64 Wn. App. at 474-75.

[30] *In re Det. of LaBelle*, 107 Wn.2d at 221-23.

the relatively short periods of time that the varying conditions at ERs should involve, we conclude that this approach properly balances the interests at stake here.

We now proceed to apply the above considerations to each of respondents' cases.

## B.B.

An ambulance brought B.B. to HMC at 5:50 P.M. B.B. was restrained after punching a nurse. At 6:15 P.M., a social worker evaluated B.B. and diagnosed him as "schizoaffective" and "manic." The record does not indicate at what point after the evaluation the social worker determined that CDMHP referral was necessary. But given that the CDMHP detained B.B. shortly before midnight, he necessarily was detained less than six hours after the determination was made.

On this record, we do not see a due process violation. The record indicates that he was a combative patient who was difficult to begin to evaluate. These circumstances justified the 25-minute period between his arrival and the evaluation and determination to refer by ER staff.

On the basis of the above analysis, we reverse the order dismissing the petition for B.B.

## C.W.

The Seattle police brought C.W. to HMC at 9:20 A.M. after he screamed and attempted to grab other patrons at a coffee shop. He was restrained upon arrival because he was extremely agitated, combative, and threatened to slit throats. A social worker first evaluated him at 10:30 A.M. and eventually referred him to the CDMHP at 12:20 P.M. C.W. was detained by the CDMHP at 4:10 P.M. Because detention by the CDMHP occurred about four hours after the determination that CDMHP referral was necessary, there was no violation of RCW 71.05.050's six-hour detention period.

Moreover, there was no due process violation. The approximately one-hour period between C.W.'s arrival at the ER and evaluation by the staff was justified. C.W. was extremely combative and required medication during that period. Thus, the delay prior to the evaluation and determination to refer to the CDMHP was justified under the circumstances.

We reverse the order dismissing the petition as to C.W.

## T.B.

T.B. was brought to Valley Medical Center at 10:54 P.M. by Auburn police after she verbally and physically assaulted her daughter. A physician examined her shortly thereafter and diagnosed her with Bipolar Affective Disorder and exacerbation of mania. At 12:30 A.M., a social worker began to assess T.B.'s condition by interviewing her, reviewing the police report, and contacting T.B.'s brother, daughter, and outpatient treatment provider. At one point during the interview, T.B. swung her fists at the social worker. An on-call case manager then interviewed T.B. and asked her what her safety plan was when T.B. returned home. In response, T.B. stated she would not talk any more and lunged at the case manager. At 3:30 A.M., the social worker referred T.B. to the CDMHP. At 6:45 A.M., the CDMHP detained T.B. Because T.B. was detained less than six hours after the social worker determined to refer her to the CDMHP, there was no violation of RCW 71.05.050.

On this record, we hold there was no due process violation. A physician examined her shortly after her arrival and diagnosed her, in part, with exacerbation of mania. Later, a social worker continued the evaluation, during which time T.B. was combative, swinging her fists at the social worker. T.B. also lunged at a case manager. The difficulties in evaluating this patient justified the delay between arrival at the ER and the determination to refer. Therefore, we reverse the order dismissing the petition for T.B.

## R.F.

An ambulance brought R.F. to HMC at 8:20 A.M. The police had found R.F. in the street labile and showing signs of anxiety. An ER social worker interviewed R.F. at 10:30 A.M. and found him extremely disorganized, labile, and unable to care for himself. At 11:45 A.M., the social worker received a call from R.F.'s mother, who indicated that R.F. was taking medication for depression and that she was en route to HMC to take R.F. back to Oregon. When informed of this, R.F. responded that he would not return to Oregon with his mother. He also indicated that he believed that a drink given to him by ER staff poisoned him. At 12:55 P.M., the social worker determined that referral to the CDMHP was appropriate because he was unable to care for his own health and safety. R.F. was detained by the CDMHP at 5:55 P.M. Because R.F. was detained for CDMHP referral five hours after the social worker determined the referral was necessary, there was no violation of RCW 71.05.050.

There was no due process violation. The record shows that R.F. was detained for two hours and 10 minutes between his arrival at the ER and the beginning of the social worker's evaluation. The hospital records indicate that R.F. was incomprehensible and extremely agitated and hostile. During that period, ER staff examined R.F. at triage, monitored him every half hour, and contacted his relatives in Oregon. Under these circumstances, we hold that the delay between arrival at the E.R. and determining to refer him to the CDMHP was justified.

Accordingly, we reverse the order dismissing the petition as to R.F.

## D.M.

An ambulance brought D.M. to HMC after a police officer saw him sitting in a running car with a hose attached to the exhaust pipe leading to the car window. ER staff transferred him to another hospital for treatment of carbon

monoxide poisoning. At 6:45 A.M., D.M. returned to HMC and was medically cleared for psychiatric evaluation at 10:50 A.M. A social worker began to interview him at 2:30 P.M. and referred him to the CDMHP. D.W. was detained by the CDMHP less than six hours later at 6:40 P.M. Accordingly, HMC complied with the six-hour detention period.

However, there is insufficient evidence in this record to justify the delay of over three and one-half hours between the time D.M. was medically cleared for psychiatric evaluation and the beginning of the social worker's psychological evaluation. We would be speculating if we were to conclude that any of the factors enumerated in the prior portion of this opinion justified the delay here. We decline to speculate. The State has failed to meet its burden on the record that is before us.

What remedy is proper for this unjustified delay? The parties dispute this point.

Citing *In re Detention of Swanson*, respondents argue the only proper remedy for violation of the statute is dismissal of the petitions. Citing the same case, the State points to certain language that may suggest that dismissal may not be the proper remedy.[31] We conclude that we need not decide the appropriate remedy for this case.

█ First, the language in *Swanson* that the State cites is dictum. Second, we are disinclined to decide the appropriate remedy for violation of this newly announced rule to address the statute's potential for due process violation in the context of this otherwise moot case and the very limited record presented here. Indeed, the appropriate remedy, like the appropriate procedural safeguards required by due

---

[31] In dictum, the *Swanson* court stated that

If Harborview had totally disregarded the requirements of the statute or had failed to establish legal grounds for Swanson's commitment, certainly dismissal would have been proper. Indeed, it would have been required. *However, if the intent of the statute is to be fulfilled and absurd results are to be avoided, dismissal cannot turn on the vagaries of scheduling, especially in these unpredictable and sensitive proceedings.*

*In re Det. of Swanson*, 115 Wn.2d at 31 (emphasis added).

process, should be tailored to the specific function served by the remedy.[32] This, in turn, may require consideration of

> "[t]he precise nature of the interest that has been adversely affected, the manner in which this was done, the reasons for doing it, the available alternatives to the procedure that was followed, the protection implicit in the office of the functionary whose conduct is challenged, [and] the balance of hurt complained of and good accomplished . . . ."[33]

Neither this record nor the briefing of the parties adequately addresses these issues. Thus, we decline to consider the issue of remedy for this case. We limit our resolution of this appeal to vacation of the order of dismissal because it was based on an incorrect reading of the statute. We do not decide what remedy would have been proper on applying due process analysis.

## E.S.

The Seattle police brought E.S. to HMC at 9:15 P.M. after his sister stated he was acting bizarre, had assaulted a housekeeper, and stopped taking his medications. E.S. has a history of paranoid schizophrenia and was recently discharged from Western State Hospital. A social worker began to interview E.S. at 12:05 A.M. and referred him to the CDMHP at 1:10 A.M. Approximately five hours later, the CDMHP detained E.S. HMC complied with the six-hour detention period.

The two-hour and 50-minute period between E.S.'s arrival at the ER and the beginning of evaluation by the social worker is unexplained. Absent proof by the State to justify the delay, there appears to be no justification for this detention. Thus, as in the case of D.M., we vacate the order dismissing the petition for E.S.

---

[32] *Olympic Forest Prods., Inc. v. Chaussee Corp.*, 82 Wn.2d 418, 423, 511 P.2d 1002 (1973) (citing *Goldberg v. Kelly*, 397 U.S. 254, 267, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970)).

[33] *Olympic*, 82 Wn.2d at 423-24 (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 163, 71 S. Ct. 624, 95 L. Ed. 817 (1951) (Frankfurter, J., concurring)).

738

We reverse the orders dismissing the petitions as to R.F., C.W., B.B., and T.B.

We vacate the orders dismissing the petitions as to D.M. and E.S.

WEBSTER and APPELWICK, JJ., concur.

Review granted at 145 Wn.2d 1007 (2001).