# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

In the Matter of the Detention of:

K.I.

STATE OF WASHINGTON,

           Respondent,

v.

K.I.,

           Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

DIVISION ONE

No. 69139-2-I

UNPUBLISHED OPINION

FILED: November 12, 2013

DWYER, J. – The interval between a person's arrival at an emergency room and their referral to a County Designated Mental Health Professional (CDMHP) for evaluation and potential involuntary commitment is protected by due process. In this case, the court concluded that a three and a half hour delay between K.I.'s arrival in an emergency room and her referral to a CDMHP did not violate due process. The court also concluded that, due to a mental disorder, K.I. presented a likelihood of serious harm to others and that the State's involuntary commitment petition should be granted. We affirm.

I

The material facts are largely undisputed. At approximately 6:00 p.m. on June 27, 2012, K.I. arrived at the emergency room of Harborview Medical Center. Fifteen minutes later, hospital staff transferred her to the Psychiatric Emergency Services (PES) unit. Following a psychiatric evaluation, lab work,

and a period during which K.I. had to be restrained, staff referred her to the CDMHP at 9:40 p.m.

The next morning, at 3:20 a.m., the CDMHP took K.I. into custody. The State then filed a petition requesting K.I.'s detention for up to 72 hours for evaluation and treatment. The petition alleged in part that K.I. suffered from a mental disorder, that she was suicidal, agitated, repeating nonsensical phrases, responding to internal stimuli, and pounding incessantly on glass. The petition referenced the declaration of Dr. Jessica Yeatermeyer, who evaluated K.I. in the Harborview emergency room. It also referenced a June 24, 2012 police report alleging that K.I. kicked a motel manager in the stomach. The petition alleged that K.I. presented "an imminent risk of serious harm to herself and to others."

In a declaration attached to the petition, Dr. Yeatermeyer stated that K.I. has a history of schizoaffective disorder and that Northwest Hospital had released her on June 27, 2012, following a 72-hour hearing. K.I.'s behavior in the Harborview emergency room "required seclusion for the safety of herself and staff." Dr. Yeatermeyer concluded that K.I. "would be a danger to herself if she were discharged" and recommended involuntary detention.

On June 29, 2012, the State filed a petition for a 14-day involuntary treatment. This petition alleged that K.I. presented a likelihood of serious harm to herself and others. On July 2, 2012, K.I. moved to dismiss the involuntary treatment petition.

At the hearing on the petition and motion to dismiss, K.I. argued in part that "any delay between the time that [she was] admitted to the PES for psychiatric evaluation and the time that a referral to the [C]DMHP [was] made needs to be . . . justified by a preponderance of the evidence. And that was stated in In Re C.W.[147 Wn.2d 259, 53 P.3d 979 (2002)] . . . ." The court denied the motion to dismiss, concluding that there was no undue delay preceding K.I.'s referral to the CDMHP.

The court then heard testimony regarding the involuntary treatment petition. Dr. Jessica Yeatermeyer testified to the allegations in her earlier declaration. Dr. Brent O'Neal, a clinical psychologist, testified that he evaluated K.I. based on information she provided, his own observations, a review of her medical chart, and consultation with hospital staff. He described an incident during which K.I. refused to step out of an office doorway, became combative when staff attempted to assist her to her room, and was ultimately placed in seclusion for the safety of others. He also read a chart note stating that K.I. exhibited "increasing agitation overnight with yelling, threats to staff, spitting on staff, hard pounding against the nursing station door and then her own door."

Over K.I.'s hearsay objection, Dr. O'Neal testified concerning a recent assault charge:

> So in May it's my understanding she was charged with assault, found not competent at mental health court, and assigned case management staff. . . . [A]nd on June 24th there's a police report here that indicates she assaulted another in an unprovoked manner

indicating that she kicked . . . the alleged victim here in the stomach.

The court overruled the objection, stating, "[i]t's the basis of his opinion as to why she's a harm to others."

Dr. O'Neal concluded that K.I. had schizoaffective disorder and posed a substantial risk of physical harm to herself and others.

The court granted the involuntary treatment petition. It concluded that while the evidence was insufficient to show that K.I. presented a substantial risk of harm to herself, "[a]ll of the events indicate . . . that she's placing others in reasonable fear of substantial harm." The court's written findings stated in part:

> The respondent suffers from paranoid thinking; she has volatile behavior requiring repeated and multiple seclusion and restraint periods throughout her stay; she has been volatile with staff; she has been spitting on staff; she has been noted to [be] responding to internal stimulus; she has a history of prior ITAs involving assault; and for her safety and the safety of others, she has been placed in seclusion. At times, she became resistant and combative and had her fists clenched.[1]

K.I. appeals the court's denial of her motion to dismiss and its decision granting the State's 14-day petition.[2]

---

[1] K.I. has not assigned error to this finding.

[2] Although the parties recognize that the issues before us are moot, both request that we address them under In re Det. of M.K., 168 Wn. App. 621, 625, 629, 279 P.3d 897 (2012) (civil commitment not moot "because a trial court presiding over future involuntary commitment hearings may consider [committed person's] prior involuntary commitment orders when making its commitment determination") or the criteria for review of moot issues. In re Det. of Swanson, 115 Wn.2d 21, 24, 793 P.2d 962, 804 P.2d 1 (1990). Given the parties' agreement and our authority to review moot issues, we exercise our discretion to do so.

No. 69139-2-I–I/5

II

K.I. first contends that the court erred in denying her motion to dismiss because the delay between her arrival in the emergency room and her referral to the CDMHP violated due process. We disagree.

The time between an involuntarily committed person's arrival at a hospital and their referral to a CDMHP under RCW 71.05.050[3] is protected by due process. In re Det. of C.W., 147 Wn.2d 259, 279, 53 P.3d 979 (2002). The State has the burden of proving by a preponderance of the evidence that any delay during that time period was justified. C.W., 147 Wn.2d at 278. The State can "meet its burden in most cases by reference to hospital records and statements by hospital personnel." C.W., 147 Wn.2d at 279. We review a court's conclusion that there was no due process violation de novo.[4]

The trial court concluded that the three and a half hour delay between K.I.'s arrival in the emergency room and her referral to the CDMHP was not

---

[3] RCW 71.05.050 states in pertinent part:
[I]f a person is brought to the emergency room of a public or private agency or hospital for observation or treatment, the person refuses voluntary admission, and the professional staff of the public or private agency or hospital regard such person as presenting as a result of a mental disorder an imminent likelihood of serious harm, or as presenting an imminent danger because of grave disability, they may detain such person for sufficient time to notify the county designated mental health professional of such person's condition to enable the county designated mental health professional to authorize such person being further held in custody or transported to an evaluation treatment center pursuant to the conditions in this chapter, but which time shall be no more than six hours from the time the professional staff determine that an evaluation by the county designated mental health professional is necessary.

[4] State v. Mullen, 171 Wn.2d 881, 893-94, 259 P.3d 158 (2011) (alleged due process violations are reviewed de novo); In re Det. of A.S., 91 Wn. App. 146, 157 n.6, 955 P.2d 836 (1998), aff'd, 138 Wn.2d 898, 982 P.2d 1156 (1999) (motions to dismiss involving pure questions of law are reviewed de novo).

"unreasonable in an emergency room when somebody is coming in and can have a variety of different things that they have to determine what's at play here." The court also stated that the delay was not undue "in the major trauma center in a five state area." These reasons are not sufficient, by themselves, to show that the delay in this case was justified. Nevertheless, we may affirm the trial court on any basis supported by the record. LaMon v. Butler, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989). A review of the record demonstrates that the delay was justified and that there was no violation of due process.

The record establishes the following circumstances and timeline. K.I. arrived at the hospital around 6:00 p.m. Staff transferred her to PES at 6:15. An initial evaluation commenced at that time.

At 6:25 p.m., staff noted that K.I. was "disheveled, limited verbal interaction, irritable, making a fist . . . body posturing. Repeating the word 'Malachi, Malachi.' Chanting. . . . Alteration in thought process . . . provide a safe least restrictive environment [and] data base, [patient] teaching, explain eval[uation] process. Labs obtained." During her evaluation at the PES unit, K.I. told Dr. Jessica Yeatermeyer that she was suicidal and asked to be admitted. When asked what would be helpful about hospitalization, K.I. said, "Century Link, Century Link, Century Link, Malachi, Malachi, Malachi." K.I. said that she felt safe in the hospital, and when asked if she would feel safe if she left, K.I. said, "I am suicidal."

Between 7:30 and 7:40 p.m., staff commenced and completed a drug screening of K.I.'s urine.

At 7:43, K.I. complained of soreness. Staff offered her Tylenol, but she refused.

According to Dr. Yeatermeyer, several hours after the initial PES evaluation, or around 8:30 p.m., K.I. became so agitated that she had to be secluded for the safety of herself and the staff. Thirty minutes later, she "pounded incessantly on the door of her room with great force against the glass." Dr. Yeatermeyer said that "this behavior . . . posed a danger to herself and required [her] to be put into four-point restraints." In her final report, Dr. Yeatermeyer stated that K.I.'s history "was limited because of: uncooperativeness."

At 9:00 p.m., staff gave K.I. some Tylenol. At 9:40 p.m., staff referred her to CDMHP.

This evidentiary timeline demonstrates by a preponderance of the evidence that the delay between K.I.'s arrival and referral to the CDMHP was justified. See In re Det. of C.W., 105 Wn. App. 718, 20 P.3d 1052 (2001), aff'd, 147 Wn.2d 259, 53 P.3d 979 (2002) (rejecting several due process challenges based on delays of over four hours and emphasizing difficulties created by

patients' combativeness, hostility, and mental states).  The court did not err in denying K.I.'s motion to dismiss.[5]

K.I. also contends that the court erred in granting the 14-day commitment petition because the State failed to prove a recent overt act.  Again, our review is de novo.[6]  There was no error.

Involuntary commitment is authorized if, among other things, a person with a mental disorder poses a substantial risk of harm to others.  RCW 71.05.240(3); RCW 71.05.020(25).  The State must show "[a] substantial risk that . . . physical harm will be inflicted by a person upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm."  RCW 71.05.020(25).  To satisfy this requirement, the State must prove "a substantial risk of physical harm *as evidenced by a recent overt act.*"  In re Det. of Harris, 98 Wn.2d 276, 284, 654 P.2d 109 (1982) (emphasis added).  The overt act "may be one which has caused harm or creates a reasonable apprehension of dangerousness."  Harris, 98 Wn.2d. at 284-85.  K.I. contends the State presented no evidence of an overt act.  She is mistaken.

---

[5] Moreover, dismissal is generally not an appropriate remedy for violations of RCW 71.05.050.  C.W., 147 Wn.2d at 282.  Dismissal is only appropriate "in the few cases where hospital staff or the CDMHP 'totally disregarded the requirements of the statute.'"  C.W., 147 Wn.2d 283 (quoting Swanson, 115 Wn.2d at 31).  This is not one of those few cases.

[6] We review conclusions of law de novo.  State v. Johnson, 155 Wn. App. 270, 277, 229 P.3d 824 (2010).  Whether evidence meets commitment criteria is also an issue we review de novo.  In re Det. of Elmore, 162 Wn.2d 27, 37, 168 P.3d 1285 (2007).

The superior court's unchallenged findings establish that K.I. engaged in "volatile behavior requiring repeated and multiple seclusion and restraint periods," that she had been "spitting on staff," and that she became resistant and combative and had her fists clenched. The court's findings also incorporate the testimony of Dr. O'Neal, who testified that K.I. became resistant and combative when staff attempted to assist her to her room, and that she was yelling, threatening, and spitting on staff. The court also incorporated Dr. Yeatermeyer's testimony by reference. She testified that when K.I. became aggressive and got "in the face of staff," they backed away from her. These facts, and the reasonable inferences that can be drawn therefrom, support the court's conclusion that K.I. created a reasonable apprehension of dangerousness and thus committed a recent overt act.

Affirmed.

We concur: