[No. 26223-8-I.    Division One.    March 2, 1992.]

*In the Matter of the Detention of* ROBERT J. CHORNEY, *Appellant.*

*Jay H. Krulewitch* and *William Salen* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Katharine B. Wilcox, Senior Deputy,* for respondent.

PEKELIS, J. — Robert J. Chorney appeals from an order committing him for up to 14 days of involuntary psychiatric treatment. Chorney contends the trial court erred in failing to make a determination on the question of whether he had "not in good faith volunteered" within the meaning of RCW 71.05.230(2). We agree with Chorney's contention.

I

Robert Chorney suffers from a condition which he states prevents him from coping with stress or controlling his anger. To manage these problems, Chorney resided at a halfway house and received outpatient mental health counseling at Harborview Medical Center (Harborview). Nevertheless, on occasion, Chorney felt he was "losing control". On these occasions, Chorney would voluntarily admit himself to various hospitals for psychiatric treatment. Between 1983 and 1989, Chorney voluntarily admitted himself for psychiatric treatment on nine occasions. Prior to the instant incident, Chorney had never been committed for involuntary treatment.

In September 1989, Chorney was experiencing intense stress arising primarily from his relationship with his girl friend. Sensing that he was "losing control", Chorney presented himself for voluntary psychiatric treatment at Providence Medical Center (Providence) on the morning of September 19, 1989. Because no beds were available at Providence, Chorney was sent to Harborview.

At Harborview, Chorney was refused admission into the 3 Mental Health unit (3MH), an unlocked voluntary psychiatric unit. Instead, Chorney was admitted as a voluntary patient to 8-C, Harborview's locked psychiatric unit. Chorney asserts that he was not told prior to his admission there that 8-C was a locked unit.

In 8-C, Chorney was interviewed by Dr. J. Michael Gallagher. Chorney told Dr. Gallagher he was "nearly out of

control" and that he heard voices telling him to kill himself. Chorney also told Dr. Gallagher he wanted to leave 8-C and to find out who rejected him for admission to 3MH.

Chorney was then evaluated by a King County designated mental health professional. At 12:20 p.m., Chorney was involuntarily detained pursuant to RCW 71.05.150(2) on the ground that he presented "a danger to [him]self" due to his "mental/emotional disorder".[1]

Apparently in response to his involuntary detention, Chorney became agitated and hostile later that evening. Joyce Shaffer, Ph.D., testified that at one point, another staff member had found Chorney with a belt tied in a noose around his neck, attempting to stand on top of a bed.[2] Chorney was immediately placed in involuntary restraints.

Chorney was kept in restraints for the next 48 hours. Chorney continued to exhibit agitated and hostile behavior. Dr. Shaffer testified that Chorney refused medication, shouted obscenities, and threatened the hospital staff with physical violence. Dr. Shaffer also testified that Chorney threatened to kill himself.

On September 21, 1989, Drs. Shaffer and Gallagher filed a petition for an additional 14 days of involuntary treatment. The petition alleged that Chorney's mental disorder presented "a likelihood of serious harm to [him]self". The petition also stated that Chorney "has been advised of the need for voluntary treatment and . . . has not accepted".

---

[1] RCW 71.05.150(2) provides, in pertinent part:

**"Detention of mentally disordered persons for evaluation and treatment — Procedure.**

"(2) When a mental health professional designated by the county receives information alleging that a person, as the result of a mental disorder, presents an imminent likelihood of serious harm to himself or others, or is in imminent danger because of being gravely disabled, after investigation and evaluation of the specific facts alleged . . ., the mental health professional may take such person, or cause by oral or written order such person to be taken into emergency custody in an evaluation and treatment facility for not more than seventy-two hours as described in RCW 71.05.180."

[2] Chorney contends that he wrapped his belt around his shoulder or arm to protect himself from "sixteen" members of the hospital staff who were attempting to restrain him.

A probable cause hearing was held on September 22, 1989. Dr. Shaffer testified on Chorney's self-reported anger control problem, as well as his admissions of auditory command hallucinations to kill himself and his thoughts of violence. She also testified about Chorney's suicide attempt. Dr. Shaffer opined that absent further treatment, Chorney's risk of harm to himself as a result of his mental disorder was "exceptionally high". Dr. Shaffer testified further that Chorney did not qualify as a good faith voluntary patient because he was unwilling to follow prescribed treatment and was unable to control his behavior.

The trial court ordered that Chorney be committed to Western State Hospital for involuntary treatment for a period not to exceed 14 days. The order was based on the trial court's findings that, due to a mental disorder, Chorney presented "a likelihood of serious harm to others and . . . himself ", and that "[t]reatment in a less restrictive alternative setting . . . is (not) in the best interest of [Chorney] and others." The trial judge made no finding on the issue of whether Chorney was a good faith voluntary patient; indeed, the trial judge noted at the hearing that the court "[did] not have the ability to determine the issue of the lack of a volunteer status." Chorney appeals from the trial court's order.

## II

Chorney concedes that this case is technically moot because his 14-day involuntary commitment has ended. He argues, however, that this court should decide this case on its merits because the issues presented are of substantial public interest.

In general, "where only moot questions or abstract propositions are involved, . . . the appeal . . . should be dismissed." *Sorenson v. Bellingham*, 80 Wn.2d 547, 558, 496 P.2d 512 (1972). A case is moot if the court can no longer provide appellants effective relief. *In re LaBelle*, 107 Wn.2d 196, 201, 728 P.2d 138 (1986).

■■ However, a court may decide a moot case if it involves matters of continuing and substantial public interest.

*In re Swanson*, 115 Wn.2d 21, 24, 793 P.2d 962, 804 P.2d 1
(1990). The criteria for determining whether or not a sufficient public interest is involved is:

> (1) the public or private nature of the question presented; (2)
> the desirability of an authoritative determination which will
> provide future guidance to public officers; and (3) the likeli
> hood that the question will recur.

*Dunner v. McLaughlin*, 100 Wn.2d 832, 838, 676 P.2d 444
(1984) (citing *Sorenson*, 80 Wn.2d at 558). Our courts have
consistently stated that clarifying the statutory scheme
governing civil commitment "is a matter of continuing and
substantial public interest." *McLaughlin*, 100 Wn.2d at 838;
*accord, In re Swanson*, 115 Wn.2d at 24-25; *In re LaBelle*,
107 Wn.2d at 200; *In re Cross*, 99 Wn.2d 373, 377, 662 P.2d
828 (1983); *In re Harris*, 98 Wn.2d 276, 278, 654 P.2d 109
(1982).

Here, section .230(2) of the civil commitment statute
authorizes the professional staff of an evaluation and treatment facility to file a petition in superior court for 14-day
involuntary treatment if the staff determines, *inter alia*,
that a potential detainee "has not in good faith volunteered". RCW 71.05.230(2). The statute does not specifically
provide that the trial court make a finding that the potential detainee does not qualify as a good faith voluntary
patient before ordering involuntary treatment. Nevertheless, Chorney contends that both the statute and principles
of due process require that the State prove by a preponderance of the evidence that a potential detainee has "not in
good faith volunteered". In addition, he argues that the trial
court must make a specific finding that a potential detainee
has *not* in good faith volunteered before it can order 14-day
involuntary treatment.

Applying the *McLaughlin* criteria here, we conclude that
the issues raised by Chorney are public in nature and, as
reflected in the divergent claims of the parties, need clarification. In addition, given the relative frequency of 14-day

involuntary commitments, the likelihood that these issues will recur is high. For these reasons, we address the merits of the issues presented.

## III

Washington's civil commitment statute imposes a detailed set of procedures which are expressly intended, *inter alia*, to end the inappropriate commitment of mentally disordered persons and to safeguard individual rights. RCW 71.05.010(1), (3). Accordingly, 14-day involuntary commitments may only be imposed by judicial order. RCW 71.05-.200(1)(a), .210, .240. Such an order may be issued only if a trial court determines that probable cause exists to commit a person. *See* RCW 71.05.230(7). Probable cause exists if the trial court finds by a preponderance of the evidence that a person, as the result of a mental disorder, presents a likelihood of serious harm to himself or herself or others, or is gravely disabled, and, after considering less restrictive alternatives to involuntary treatment, finds that no such alternatives are in the best interests of the person or others. *See* RCW 71.05.240.

A party seeking commitment must petition the trial court to show cause and can do so only if it meets certain conditions. Under RCW 71.05.230(1), the professional staff of an evaluation and treatment facility is required to analyze a potential detainee's condition and must find that the condition is caused by a mental disorder that either results in a likelihood of serious harm to the potential detainee or others, or in the potential detainee being gravely disabled. According to this provision, the professional staff must be "prepared to testify" that this condition was met. Moreover, RCW 71.05.240 requires the trial court to "find[] by a preponderance of the evidence" that, as a result of a mental disorder, the potential detainee presents "a likelihood of serious harm to others or [to] himself or herself, or is gravely disabled" before ordering involuntary treatment.

The statute also seeks to ensure that a potential detainee's right to receive voluntary treatment is not unjustly denied. *See* RCW 71.05.010(3), .050. Thus, the statute establishes procedures to protect a good faith voluntary patient from being compelled to submit to involuntary treatment. RCW 71.05.230(2) requires that the professional staff advise the potential detainee of the need for voluntary treatment. Further, this provision provides that the professional staff have "evidence" that the potential detainee "has not in good faith volunteered".[3] There is no express requirement in the statute that the trial court make a finding that the potential detainee has not in good faith volunteered before ordering involuntary treatment.

The State takes the position that in order to commit Chorney for involuntary treatment, it was required only to show that the professional staff *had evidence* that Chorney had not in good faith volunteered for treatment. Chorney contends that the statute required the State to *prove* to the trial court's satisfaction that he was not a good faith voluntary patient.

█ The court's primary purpose in interpreting a statute is to ascertain and give effect to the intent of the Legislature. *State v. Keller*, 98 Wn.2d 725, 728, 657 P.2d 1384 (1983). The Legislature's intent is determined primarily from the language of the statute itself. *Washington Pub. Util. Dists.' Utils. Sys. v. PUD 1*, 112 Wn.2d 1, 6, 771 P.2d 701 (1989).

The statute's language regarding the issue of good faith voluntariness is subject to several interpretations. Chorney argues that, in view of the statute's explicit preference for voluntary treatment, the Legislature must have intended that a *judicial* determination be made regarding a potential

---

[3]RCW 71.05.230 provides that a person detained for 72-hour evaluation and treatment may be detained for not more than 14 additional days of involuntary intensive treatment "if the following conditions are met:"

"(2) The person has been advised of the need for voluntary treatment *and the professional staff of the facility has evidence that he or she has not in good faith volunteered*". (Italics ours.)

detainee's good faith voluntariness. Furthermore, the term "evidence" is a term of art which refers to a species of proof to be evaluated by a trier of fact in determining whether to accept the contention for which it is offered. Black's Law Dictionary 555 (6th ed. 1990).

On the other hand, there is no express requirement in RCW 71.05.240 that the trial court find that a potential detainee has not in good faith volunteered before ordering involuntary treatment. Furthermore, RCW 71.05.230(1) requires professional staff to be "prepared to testify" about a potential detainee's mental condition, while RCW 71.05.230(2) simply requires that professional staff "ha[ve] evidence" that a potential detainee has not in good faith volunteered. This difference could be interpreted as evidencing a legislative intent to require less proof on the issue of good faith voluntariness than on the issue of a potential detainee's mental condition.

■ However, in order to pass constitutional muster, the statute must satisfy the requirements of due process. Since involuntary commitment for a mental disorder is a significant deprivation of liberty, Chorney is correct in stating that the State cannot accomplish it without due process of law. *See Addington v. Texas*, 441 U.S. 418, 425, 60 L. Ed. 2d 323, 99 S. Ct. 1804 (1979); *In re Harris*, 98 Wn.2d at 279. In light of the potential curtailment of liberty effected under the civil commitment statute, the right to due process requires the intervention of an impartial third party to ensure that procedural requirements have been met. *See In re Harris*, 98 Wn.2d at 287-88.

■■ Where a statute is susceptible to an interpretation which may render it unconstitutional, we are admonished to adopt a construction which will sustain the statute's constitutionality. *See In re Cross*, 99 Wn.2d at 382-83. In order to sustain its constitutionality, we thus construe RCW 71.05.230(2) as requiring the trial court to make a specific determination that a potential detainee has not in good faith volunteered for appropriate treatment before ordering involuntary treatment. This determination should be based

on evidence presented by the professional staff and any other evidence presented which bears on this issue. We further hold, however, that this burden on the State arises only where the potential detainee has put his or her status as a good faith voluntary patient at issue.

In a civil commitment proceeding, the petitioner is assigned the burden of proof on each element of its case by the requisite standard of proof. *Dunner v. McLaughlin*, 100 Wn.2d 832, 846, 676 P.2d 444 (1984). Thus, the State must prove that the potential detainee is *not* a good faith voluntary patient by a preponderance of the evidence. *See* RCW 71.05.240; *In re LaBelle*, 107 Wn.2d 196, 214, 728 P.2d 138 (1986). Here, because Chorney asserted that he had volunteered in good faith for appropriate treatment, the State was required to prove by a preponderance of the evidence that Chorney had not.

## IV

Chorney further contends that in his case, had the trial court made a determination regarding his status as a good faith voluntary patient as it was required to do, the evidence would have resulted in a finding that he *had* in good faith volunteered for treatment within the meaning of RCW 71.05.230(2). Chorney points out that he voluntarily, *i.e.*, without coercion, presented himself for psychiatric treatment and that he was willing in good faith, *i.e.*, "without deception or deceit", to continue treatment. He contends that satisfying these criteria is all that is required to meet the "good faith" element of RCW 71.05.230(2).

■ We disagree that a potential detainee's initial presentation for voluntary treatment and his or her genuine representation that continued appropriate treatment is desired are sufficient to satisfy the requirement of "good faith". The fact that the potential detainee initially volunteered to be a patient at a mental health facility has little bearing on his or her present status at the time of the

probable cause hearing. The critical factor is the potential detainee's recent history of actual compliance with prescribed procedures and treatment. In order to qualify as a good faith voluntary patient under RCW 71.05.230(2), a potential detainee must not only express a willingness to abide by the procedures and treatment plan prescribed by the treatment facility and professional staff to whom the person has "in good faith volunteered", but must have a "track record" which does not belie this stated intent.

In short, while a potential detainee must express a willingness to accept appropriate medical treatment which is sincere, *i.e.*, without deception or deceit, in order to demonstrate "good faith", this will not in itself be dispositive. If the State is able to show lack of cooperation with prescribed procedures and treatment, this will constitute evidence that the potential detainee is not a good faith voluntary patient. It is immaterial that the potential detainee may not be able to cooperate or, as Chorney claims here, that his fragile mental state was exacerbated as a result of being involuntarily detained after he was initially admitted as a voluntary patient.

Given the standard enunciated herein, we conclude that on this record the trial court could only have determined that Chorney was not a good faith voluntary patient at the time of the probable cause hearing. Although Chorney voluntarily presented himself for admission to Harborview initially, he objected to his prescribed treatment and became so agitated and threatening that he had to be placed in restraints. Moreover, at the probable cause hearing, Chorney's position was that he wished to leave Harborview immediately and resume outpatient treatment. This treatment alternative was clearly unreasonable. In short, Chorney's impaired insight into his behavior, together with his recent violent behavior, negated any possibility that Chorney would be found to be a good faith voluntary patient within the meaning of RCW 71.05.230(2).

Thus, the trial court did not err in ordering Chorney to undergo involuntary treatment for up to 14 days.

Affirmed.

GROSSE, C.J., and FORREST, J., concur.