# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

IN RE THE DETENTION OF J.D.,

STATE OF WASHINGTON,

Respondent,

v.

J.D.,

Appellant.

No. 74317-1-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: April 3, 2017

SPEARMAN, J. — A patient may not be involuntarily committed for treatment when he or she volunteers in good faith to abide by the prescribed treatment plan. J.D. challenges the trial court's order committing her for up to fourteen days of involuntary treatment, asserting that the trial court erred in concluding that she was not a good faith voluntary patient. But because substantial evidence supports the trial court's findings of fact, and these support the trial court's conclusion of law, we affirm.

## FACTS

J.D. suffers from depression and chronic pain. On September 27, 2015, she told her primary care physician (PCP) that she had attempted to commit suicide by overdosing on Oxycodone. She agreed to inpatient psychiatric treatment and was admitted to Swedish Hospital. When she was released from

Swedish on October 6, J.D. received a referral to Sound Mental Health for outpatient mental health treatment as well as a follow-up appointment with her PCP.

J.D. did not commence outpatient mental health treatment but she did keep the appointment with her PCP. J.D. met with Dr. Philip Capp, who was filling in for J.D.'s regular doctor, on October 15 or 16. J.D. told Capp that she had flushed her anti-depressants down the toilet because they were not working, she had written her own obituary, and she was thinking of jumping off a balcony.

Capp recommended inpatient treatment and J.D. said she would consider hospitalization if he could find a bed that day. According to J.D., she waited at the clinic for hours while Capp tried unsuccessfully to locate an inpatient bed. According to Capp, J.D. was ambivalent about voluntary admission and refused to stay in the clinic or be evaluated in the emergency department. Capp referred J.D. for evaluation by a designated mental health professional (DMHP).

Virginia Witter, a DMHP, visited J.D.'s home on October 17. J.D. told Witter that she had thought about killing herself by jumping off a balcony and pointed out the balcony she would use. She explained that she would be sure to die if she jumped off a balcony that faced the main road whereas if she jumped off a different balcony she might only be paralyzed. J.D. also told Witter that, at the moment, she did not intend to kill herself. She explained that it just made her feel better to know that she had a way out. J.D. told Witter that her September overdose was not a suicide attempt. She stated that she did not have enough

pills to kill herself and that overdosing on medication was not an effective way to commit suicide.

Witter asked J.D. about outpatient therapy. Id. J.D. became tearful and said "'What would a therapist do for me? How could they help me with my problems?'" Verbatim Report of Proceedings (VRP) at 8. According to Witter, J.D. explained that she had family troubles because one son was dying of a degenerative disease and the other son had burglarized her apartment. J.D. described herself as having "no hope." VRP at 9. J.D. told Witter that she had stopped taking anti-depressants and she would not take any medication that Capp prescribed. When asked if she would take medication prescribed by another doctor, she did not respond. She stated that she would consider voluntary hospitalization.

Witter believed J.D. was at risk of attempting suicide and referred her for involuntary detention. On October 20, J.D. was detained at Swedish Hospital for seventy-two hours. Swedish filed a petition to detain J.D. for an additional fourteen days. J.D. raised a good faith voluntary defense, asserting that she volunteered for treatment in good faith and thus could not be detained for involuntary commitment. She also argued that she did not present a substantial risk of harm to herself.

At the probable cause hearing, Witter testified as to her interaction with J.D. Witter stated that J.D. seemed hopeless, appeared to believe therapy would

3

be of no use, and had stopped taking anti-depressants. In Witter's opinion, J.D. was not likely to follow through with outpatient treatment.

Richard Thomas, a clinical psychologist at Swedish Hospital, testified to J.D.'s condition during her current and previous hospitalization. He stated that J.D. had a major depressive disorder and was experiencing profound sadness and hopelessness. Thomas testified that J.D.'s mental illness had a substantial adverse effect on her cognitive and volitional functions.

Thomas stated that, when J.D. was admitted in September, she said she wanted to die. When she was admitted on October 20, J.D. stated that she had no current intent to harm herself. She acknowledged telling Capp and Witter that she had plans to jump off a balcony but stated that she was only using a figure of speech. She denied that the September overdose was a suicide attempt. However, J.D. also expressed ambivalence about living. J.D. reported to the hospital that she lived alone and had little contact with family or friends. She also reported that she had recently experienced a 40-pound weight loss, decreased appetite, and apathy. She had not established outpatient mental health treatment and was unable to articulate a "safe plan" or "safety contract" for living outside the hospital. VRP at 36-37, 46. Thomas stated that J.D. was angry at being detained in the hospital and said she wanted to get out so she could smoke and so she could visit her son.

Thomas testified that, during her current hospitalization, J.D. cooperated with prescribed procedures and treatments. But in his opinion, J.D. remained at

substantial risk for harming herself and it would not be appropriate to release her from the hospital. Thomas stated that J.D. had numerous risk factors, including a recent suicide attempt, recent suicidal ideation, continuing depression, social isolation, lack of insight into the seriousness of her symptoms, and inability to safety contract. Thomas prescribed two weeks of inpatient treatment to stabilize J.D.'s depression. He stated that voluntary hospitalization was not an option because a voluntary patient may discharge herself at any time and J.D. had repeatedly stated that she wanted to leave the hospital. He was also concerned that J.D. did not recognize the need for therapy and had recently flushed her anti-depressants down the toilet.

Near the beginning of his testimony, Thomas referred to hospital records. J.D.'s attorney objected that he had not seen all of the medical records that Thomas consulted. The trial court granted a recess for J.D.'s counsel to review the records. The hearing did not resume for about five hours and, as a result, could not be completed on Friday, October 23. J.D. remained hospitalized over the weekend. At some point during the weekend she was transferred from Swedish to Fairfax Hospital.

The hearing resumed on Monday, October 26. J.D. testified that she did not want to commit suicide because she had too much to live for. She stated that the September overdose was accidental. She explained that she sometimes forgot she had taken her medication and took a second dose by accident. She stated that after taking two doses she was intoxicated and might take another

dose. J.D. denied telling Capp that she was thinking about jumping off a balcony. She admitted talking to Witter about jumping off a balcony but said she was being sarcastic.

J.D. acknowledged she was depressed but said she was working on her health in her own way. She explained that she had not begun outpatient treatment after her first hospital stay because she was unsure whether her insurance covered treatment. J.D. stated that she went to Sound Mental Health and tried unsuccessfully to get one of the appointments reserved for uninsured patients. She said that, if outpatient treatment was recommended again, this time she would check on her insurance and make an appointment. J.D. stated that she was complying with all of her prescribed medications and would continue to take these medications if she was discharged.

J.D. testified that she agreed to inpatient treatment when Capp suggested it but could not enter the hospital because he did not find a bed. When asked if she would voluntarily agree to remain in the hospital, J.D. said she would stay at "a hospital of [her] choosing." VRP at 87. She stated that she did not want to stay at Fairfax and did not want to return to the Swedish campus where she was the previous week. She said she would be willing to go to a different Swedish campus after she checked on her apartment, visited her son, and took care of other business.

The trial court entered 35 findings of fact. As to credibility, the court found the testimony of Witter and Thomas credible. The court found that, other than her

statements against interest, J.D.'s testimony was not credible. The trial court found that J.D. was suffering from depression; the mental illness was having a substantial effect on her cognitive and emotional functions; J.D. had reported weight loss and "extreme hopelessness without a plan for mental health treatment outside of the hospital"; J.D. was exhibiting active symptoms of her mental disorder and was not yet stabilized; and J.D. was minimizing her mental disorder, her recent suicide attempt, and her repeated statements expressing suicidal thoughts. Clerk's Papers (CP) at 37-40. The court found that a less restrictive alternative to continued inpatient treatment was not appropriate or in J.D.'s best interest.

The court concluded as a matter of law that J.D. was not a good faith voluntary patient because she was not willing to remain at Fairfax for inpatient treatment. The court also concluded that J.D.'s history showed a lack of compliance with medication when not hospitalized. The trial court accordingly ordered J.D. committed for up to fourteen days.

J.D. appeals.

## DISCUSSION

J.D. contends that the trial court erred in ordering her committed for up to fourteen days.[1]

---

[1] This case is technically moot because the order which placed J.D. in involuntary detention has expired. However, this court has held that an involuntary commitment order has collateral consequences, as a patient's history of involuntary commitment may be considered in future involuntary commitment hearings. In re Detention of M.K., 168 Wn. App. 621, 629-30, 279 P.3d 897 (2012). We thus reach the issues presented in J.D.'s appeal.

7

When a patient has been committed for seventy-two hours of involuntary evaluation and treatment, the treating facility may petition for up to fourteen additional days of involuntary commitment. RCW 71.05.230. As relevant here, the petition must state that the patient is at risk of serious harm, as a result of a mental disorder and that no less restrictive alternative to involuntary detention is in the patient's best interest. RCW 71.05.230(4)(d). The State has the burden of proving these elements by a preponderance of the evidence at a probable cause hearing. RCW 71.05.240(3)(a). When, as here, a person alleges that she volunteered in good faith for treatment, the State also has the burden of proving that she does not qualify as a good faith voluntary patient. In re Chorney, 64 Wn. App. 469, 478, 825 P.2d 330 (1992). A person qualifies as a good faith voluntary patient if she expresses willingness to comply with the prescribed plan of treatment and does not have a history that belies such an expression of willingness. Id. at 479.

At the probable cause hearing in this case, the State thus had the burden of proving that (1) J.D. was at risk of serious harm due to a mental disorder; (2) no less restrictive alternative to commitment was in J.D.'s best interest; and (3) J.D. did not qualify as a good faith voluntary patient. Based on numerous findings of fact, the trial court concluded that the State met its burden and ordered J.D. committed. J.D. assigns error to three of the trial court's findings of fact and to its conclusion that she was not a good faith voluntary patient. But she does not dispute the trial court's findings that she was at risk of serious harm due to a

mental disorder or that no less restrictive alternative to inpatient care was in her best interest.

Where the State has the burden to prove an element by a preponderance of the evidence, we review the trial court's findings of fact for substantial evidence and determine whether the findings of fact support the conclusions of law.[2] In re LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986) (citing Ridgeview Properties v. Starbuck, 96 Wn.2d 716, 719, 638 P.2d 1231 (1982)). We defer to the trial court as to the credibility of witnesses and the weight of evidence. Davis v. Dep't of Labor & Indus., 94 Wn.2d 119, 124, 615 P.2d 1279 (1980).

First, J.D. assigns error to the trial court's finding that, other than her statements against interest, her testimony was not credible. But as we defer to the trial court's determinations on credibility, we reject this argument.[3] Next, J.D. assigns error to the trial court's finding that she "reported a 40 pound weight loss and extreme hopelessness without a plan for mental health treatment outside of the hospital." CP at 39. But, relying on notes from J.D.'s October hospitalization, Thomas testified that J.D. reported a 40 pound weight loss, loss of appetite,

---

[2] Relying on Chorney, the State asserts that we review the trial court's decision regarding a good faith voluntary defense for abuse of discretion. Chorney, however, does not discuss the standard of review for a trial court's decision on a good faith voluntary defense or provide any indication that the general standard of review is inapplicable.

[3] We note that J.D. does not challenge the trial court's reasons for finding that her testimony was not credible, including that she minimized her mental disorder, her recent suicide attempt and her repeated statements about her suicidal thoughts and plans to commit suicide. Nor does she contest the trial court's finding that she is suffering from a depressive disorder that "has a substantial adverse effect on her cognitive and volitional functions." CP at 37. These unchallenged findings are verities on appeal. McCleary v. State, 173 Wn.2d 477, 514, 269 P.3d 227 (2012).

apathy, and profound hopelessness. Thomas also testified that J.D. was unable to articulate a safety plan for living outside the hospital. Both Thomas and Witter testified that J.D. expressed the belief that outpatient mental health therapy would not help her. The trial court's finding is supported by substantial evidence.[4]

J.D. also challenges the trial court's finding that she "has not volunteered to undergo the treatment that has been prescribed by the treating facility and the professional staff, and therefore a less restrictive alternative is neither appropriate nor in her best interest."[5] CP at 41. She assigns error to the trial court's related conclusion that she was not a good faith voluntary patient and should be committed for up to fourteen days.

At the probable cause hearing, Thomas testified that J.D. was at substantial risk of harming herself because she demonstrated numerous risk factors, including recent suicidal ideation, lack of insight into her condition, recent noncompliance with medication, and the inability to articulate a safety plan. Given J.D.'s mental state, Thomas stated that release from the hospital was not appropriate. He prescribed two weeks continued inpatient treatment to stabilize

---

[4] We also note that J.D. does not challenge the trial court's finding that "she felt therapy would be pointless and that she was hopeless." CP at 37. This unchallenged finding is a verity on appeal. McCleary, 173 Wn.2d at 514.

[5] As noted above, J.D. argues that "the evidence indicated both that [s]he needed inpatient care and that she was willing to enter treatment when a bed became available." Br. of App. at 12-13. Thus, she does not dispute the latter portion of this finding that a less restrictive alternative was not in her best interest. Nor does she challenge the trial court's conclusion that "[t]here is no less restrictive treatment alternative available to [J.D.] at this time." CP at 42. She contests only the finding that she did not volunteer to undergo the prescribed inpatient treatment.

J.D.'s condition. Thomas's testimony establishes that the prescribed treatment was continued inpatient care at Fairfax.

In her testimony, J.D. stated that she did not want to remain at Fairfax or return to the Swedish Hospital facility where she spent the previous week. Instead, she testified that she would volunteer for inpatient care at a different Swedish facility, but only after going home to take care of personal business. J.D. asserts that this testimony supports her claim that she expressed her willingness to comply with the prescribed treatment. She contends that she agreed to inpatient treatment but reasonably sought to choose the hospital and the timing of hospitalization.

The argument is unpersuasive. First, the trial court did not find J.D.'s testimony on this issue credible. In other words, it did not find J.D.'s assertion that she would voluntarily return to the hospital of her choosing to be genuine. We will not second guess the trial court's credibility determination. Second, even on its face, J.D.'s testimony does not support a conclusion that she volunteered for inpatient treatment. Instead, she proposed that she be released to address some personal issues and then, at some undetermined time, report to a hospital of her choosing. On these facts, the trial court did not err in finding that J.D. "has not volunteered to undergo the treatment that has been proscribed by the treating facility and the professional staff" or in concluding that she was not a good faith volunteer.

J.D. asserts, however, that this court's precedent mandates an opposite conclusion. She contends that, because she cooperated with treatment during her initial detention and expressed willingness to undergo inpatient treatment at a time and place of her choosing, she was a good faith voluntary patient.[6] She relies primarily on In re Kirby, 65 Wn. App. 862, 829 P.2d 1139 (1992) for support. But the case does not support her argument.

In Kirby, a patient presented herself at a hospital for psychiatric treatment. Kirby, 65 Wn. App. at 864. She was detained for seventy-two hours. Id. Doctors from the treatment facility petitioned to detain Kirby for an additional fourteen days. Id. at 864-65. The petition apparently sought commitment at Western State Hospital, subject to the placement recommendation of Kirby's treating psychiatrist. Id. at 866. The petition stated that Kirby presented a serious risk of harm to herself and others, she was not a good faith voluntary patient because she was "'too impulsive,'" and no less restrictive alternative was appropriate because Kirby's "'judgment and impulse control [were] too impaired.'" Id. at 869-70.

At the probable cause hearing, an emergency room social worker testified. Id. at 865. According to the social worker, when Kirby first presented herself to

_____

[6] J.D. also asserts that the State failed to prove that she was truly given the option of remaining at Fairfax as a voluntary patient because it produced no evidence that a voluntary bed was available. At oral argument, J.D. argued that the lack of hospital beds for voluntary mental health treatment is a systemic failure that forces patients to submit to involuntary commitment in order to receive mental health treatment. We decline to reach this issue as beyond the scope of review. The issue for this court is whether the trial court erred in rejecting J.D.'s good faith voluntary patient defense.

the hospital for treatment she said that she might have to kill a teenage girl who lived with her, she had taken an overdose because she could not face that prospect, and someone wanted to kill her. Id. at 864. The social worker stated that Kirby was ambivalent about whether she should remain in the hospital and whether she should take medication. Id. Kirby's mother told the social worker that Kirby had not been taking her medication. Id. at 870.

Kirby testified that she was terrified of Western State Hospital and did not want to go there. Id. She stated that, if released, she would pursue outpatient treatment, take any prescribed medications, and contact her doctor or a crisis clinic if her mental disturbance recurred. Id.

The trial court found that Kirby was at substantial risk of harm and a less restrictive alternative was not in her best interest. Id. at 865. The court rejected Kirby's good faith voluntary defense and ordered her committed for up to fourteen days at Western State Hospital. Id. at 865-66.

On appeal, we agreed with Kirby that the State failed to present sufficient evidence that she was not a good faith voluntary patient. Id. at 871. We noted that, in deciding this issue, the trial court apparently relied only on the petition and the social worker's testimony.[7] Id. at 870. The trial court also appeared to disregard Kirby's own testimony, which we described as "lucid and rational." Id. Significantly, there appeared to be no finding by the trial court doubting the

---

[7] A clinical psychologist also testified at the probable cause hearing, but the opinion gives no details about this testimony and does not refer to it in relation to the trial court's decision that Kirby was not a good faith voluntary patient. Id. at 865, 869-70.

13

credibility of Kirby's testimony. We held that this record failed to meet the State's burden of proving that Kirby was not a good faith voluntary patient. Id.

J.D. contends that her case is analogous to Kirby because, like the patient in that case, she was willing to continue treatment but was opposed to treatment in a specific proposed hospital. She asserts that, under Kirby, it is not necessary for a patient to agree to the specific prescribed treatment so long as she is willing to appropriately utilize the mental health services available to her. J.D. is mistaken.

First, unlike in Kirby, the trial court in this case did not rely on conclusory assertions in the petition but instead made specific factual findings, most of which are unchallenged, to support its conclusion that J.D. was not a good faith volunteer. Second, unlike in Kirby, the trial court did not find credible J.D.'s claim that she would volunteer for commitment "in a hospital of [her] choosing" as soon as she addressed some personal issues. VRP at 87. And, in light of J.D.'s minimization of her recent suicide attempt, recent suicidal statements, recent noncompliance with prescribed medications and inability to articulate a safety plan, the trial court was rightly skeptical of the sincerity of that testimony. Finally, Kirby disputed that inpatient care was necessary in her case and presented an apparently credible less restrictive alternative. But here, even J.D. agrees that the necessary course of treatment for her condition was inpatient care. Yet she did not volunteer for that course of treatment. Instead she only agreed that at some unspecified time in the future she would voluntarily admit herself to a

No. 74317-1-I/15

hospital. Kirby does not stand for the proposition that a vague agreement to comply with the recommended course of treatment in the future is sufficient to qualify as a good faith volunteer. Because Kirby is distinguishable, J.D.'s reliance on that case is misplaced.

The State met its burden of proving that J.D. was not a good faith voluntary patient and the trial court correctly so found.

Affirmed.

WE CONCUR:

_Spearman, J._

_Verellen_

_Leach, J._

15