THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

In the Matter of the Detention of:

L.H.

)
)
)
)
)
)
)

No. 80824-9-I

DIVISION ONE

UNPUBLISHED OPINION

ANDRUS, A.C.J. — L.H. appeals the revocation of his Involuntary Treatment Act[1] (ITA) "less restrictive treatment order" (LRO), arguing the State failed to comply with statutory requirements for filing a revocation petition and the trial court failed to consider all statutorily required factors in making its decision.  We disagree and affirm.

FACTS

L.H. is a 36-year-old man diagnosed with schizoaffective disorder who has a lengthy history of in-patient treatment and involuntary commitment.  On October 18, 2019, L.H. agreed to the entry of an LRO for a period of ninety days.  The LRO imposed several conditions, including that L.H. must take all prescribed medications and must not use alcohol, marijuana, or non-prescribed drugs.  He was also obligated to participate in outpatient treatment and medication management at SeaMar Behavioral Health.

---

[1] Chapter 71.05 RCW.

On November 5, 2019, a King County designated crisis responder (DCR) filed a petition to revoke the LRO, alleging that L.H. had failed to adhere to its conditions and was demonstrating a substantial deterioration of functioning, and that there was a reasonable probability that this decompensation could be reversed by further inpatient treatment.

At the November 27 revocation hearing, Ahamee Song, a records custodian at Overlake Hospital, testified that L.H. had been detained and brought to the hospital for a psychiatric evaluation on November 4. Song read from L.H.'s medical records, which described L.H. as uncooperative and incoherent. During a psychiatric consultation, the treatment provider described L.H. as refusing to answer any questions and "appeared internally preoccupied as if hallucinating." The emergency department doctor noted that L.H. reported that "he has been missing some of his medication," and "has been increasingly paranoid," believing people were "out there trying to kill him." The doctor's notes reflect that L.H. described "increasing auditory hallucinations." L.H. tested positive for cannabis.

Cara Gresham, L.H.'s primary therapist at SeaMar for the previous year and a half, testified that she had met with L.H. weekly and at their last meeting at the end of October, he said he was not taking his prescribed medication and was using marijuana. She also testified L.H. had become increasingly unresponsive and would sit on her couch, staring at the ceiling and laughing. She described this behavior as a change from his baseline functioning because when he took his medication regularly, he did well, but when he stopped taking the medications,

"things start to go downhill." Gresham opined that further inpatient treatment could help L.H. by ensuring he took his medication regularly.

Finally, Dr. Julia Singer, a clinical psychologist who evaluated L.H. on November 26, confirmed L.H.'s diagnosis of schizoaffective disorder that adversely impacts his cognitive functioning and volitional control. L.H. told Dr. Singer that he was skipping doses of his prescribed medication and was using marijuana. During his most recent hospitalization, Dr. Singer noted that L.H. presented as anxious, agitated, uncooperative and guarded. Dr. Singer reported that L.H. had four prior ITA hospitalizations, two prior LRO revocations, and three prior voluntary psychiatric hospitalizations. The most recent hospitalization occurred because L.H. was yelling at night, not sleeping, not paying his bills, and not dealing with the paperwork he needed to complete to retain his housing subsidy. According to L.H.'s November 6 social services assessment, L.H.'s sister reported he was at risk of losing his housing because he was unable to manage his finances or otherwise take care of himself while living alone.

Dr. Singer detailed L.H.'s delusions, including that he was receiving instructions from "Stargate Command" not to talk and the government was monitoring his house. Dr. Singer opined that these symptoms were consistent with his diagnosis and were likely exacerbated by his marijuana use. Dr. Singer noted that before his hospitalization, he was reportedly not storing perishable food properly, eating spoiled food, and making himself sick. Even after two weeks in the hospital, L.H. continued to believe assassins were "out there trying to get the jobs by killing the people with the jobs." His treatment team described him as

"disheveled and malodorous," with "profound paranoid delusions." When a discharge planner met with L.H. on November 26, he was more focused and endorsed a willingness to attend outpatient mental health appointments, but stated he would only take his prescribed medication "when he thinks he needs them." Dr. Singer concluded that L.H. "is simply not well enough to be functioning outside the hospital." Dr. Singer concluded that L.H. needed inpatient treatment to address his decompensation.

L.H. denied suffering from schizophrenia, insisting that "it's part of a military operation." He admitted that he smokes marijuana and that he sometimes misses doses of his prescribed medication. He claimed he had been prescribed medical marijuana when diagnosed with Hodgkin's lymphoma and continued to use it "to try to stop the cancer from killing me." While he was willing to take the prescribed medications, he refused to stop using marijuana, insisting he needed it to fight cancer.

At the conclusion of the hearing, the trial court revoked the October 18 LRO. It found by clear, cogent, and convincing evidence that L.H. suffered from a mental disorder that had a substantial adverse effect on his cognitive and volitional functioning, that L.H. had violated the terms of the LRO, and that he was showing evidence of substantial decompensation with a reasonable probability that the decompensation can be reversed by further inpatient treatment. The court ordered L.H. to be hospitalized for treatment for a period of up to 90 days. L.H. appeals this order.

ANALYSIS

L.H. argues the State and the trial court failed to comply with certain procedural requirements for revoking an LRO under the ITA.[2] We disagree.

RCW 71.05.590(1) provides that DCR may take action to enforce, modify or revoke the LRO when (1) the individual is failing to adhere to the terms and conditions of the order; (2) substantial deterioration in the individual's functioning has occurred; (3) there is evidence of substantial decompensation with a reasonable probability that the decompensation can be reversed by further inpatient treatment; or (4) the individual poses a likelihood of serious harm. Former RCW 71.05.590(1)(a)-(d) (2019).[3]

Under RCW 71.05.590(5), when a DCR is contemplating taking action to enforce, modify, or revoke an LRO, the DCR must "consider the factors specified under RCW 71.05.212 . . . ." RCW 71.05.212(1) requires the DCR to consider "all reasonably available information from credible witnesses and records" regarding prior recommended civil commitments, the individual's historical behavior, prior findings of incompetency, and prior ITA commitments.

If a DCR determines some action is necessary, RCW 71.05.590(2) provides that "[a]ctions taken under this section must include a flexible range of responses of varying levels of intensity appropriate to the circumstances and consistent with

---

[2] Although the revocation order expired in January 2020, the State does not contend this appeal is moot. We note that Washington appellate courts have consistently "recognized that 'the need to clarify the statutory scheme governing civil commitment is a matter of continuing and substantial public interest' " and may be decided even when technically moot. In re LaBelle, 107 Wn.2d 196, 200, 728 P.2d 138 (1986) (quoting Dunner v. McLaughlin, 100 Wn.2d 832, 838, 676 P.2d 444 (1984)).

[3] Several provisions of RCW 71.05.590 were amended in 2020. LAWS OF 2020, ch. 302, § 54. These amendments do not alter our analysis.

the interests of the individual and the public in personal autonomy, safety, recovery, and compliance." The statute provides a list of some of the "available actions," including offering incentives to motivate compliance, increasing the intensity of outpatient services, requesting the court to modify, rather than revoke, the LRO, detaining the individual for an evaluation, or initiating a revocation proceeding. RCW 71.05.590(2)(a)-(e).

L.H. argues the State presented no evidence that the DCR considered "all reasonably available information from credible witnesses and records," as required by RCW 71.05.212, before filing the petition. L.H. also contends the State presented no evidence the DCR considered "a flexible range of responses," to L.H.'s decompensation, as required by RCW 71.05.590(2). The premise of both arguments is that RCW 71.05.212 and RCW 71.05.590(2) set out a series of mandatory steps a DCR must follow before they may file a revocation petition. The statutory language does not support this premise.

Statutory construction is a question of law we review de novo. In re Det. of R.H., 178 Wn. App. 941, 948, 316 P.3d 535 (2014). When construing the ITA, we will give effect to the plain and ordinary meaning of the statute's language. Id. Because civil commitment statutes authorize a significant deprivation of liberty, we will strictly construe their language. In re Det. of T.S., 14 Wn. App. 2d 36, 38, 469 P.3d 315 (2020) (quoting R.H., 178 Wn. App at 948). But we will not import requirements into the ITA when the plain language of the statute demonstrates no legislative intent to impose such requirements. See In re Det. of S.B., 7 Wn. App. 2d 337, 433 P.3d 526 (2019) (rejecting contention that requirement in RCW

71.05.280(3) that court find patient was not a voluntary good faith patient as condition of initial 14-day commitment applied to petition for 180 days of additional commitment under RCW 71.05.280(4)).

Here, the plain language of RCW 71.05.590(1), (2) and (5) demonstrates that a DCR's decision to take any action to enforce, modify, or revoke an LRO is conditioned only on the determination that one of four events has occurred: the respondent has failed to adhere to the LRO, the respondent's functioning has substantially deteriorated, the respondent has experienced a substantial decompensation which could be reversed by further treatment, or the respondent poses a likelihood of serious harm. Once the DCR determines one of these events has occurred, the DCR has the discretion to initiate a petition to revoke an LRO or to determine that another, less restrictive, step is more "appropriate to the circumstances." RCW 71.05.590(2). The language of these provisions does not demonstrate any legislative intent to mandate a specific process for deciding which action is the most appropriate or making compliance with such a process a condition precedent to filing a revocation petition.

L.H. argues that In re Chorney, 64 Wn. App. 469, 825 P.2d 330 (1992), requires us to construe RCW 71.05.590(2) as imposing pre-filing procedural requirements. But Chorney addressed an entirely different section of the ITA that, unlike the statutory language here, unequivocally identifies conditions precedent to the initiation of an involuntary commitment proceeding.

In that case, Chorney voluntarily sought psychiatric treatment before the hospital initiated an involuntary commitment proceeding for his suicidal behavior.

- 7 -

Id. at 471-73. Chorney challenged the subsequent order of commitment, arguing that under RCW 71.05.230, the State had to prove, and trial court had to find, that he had not volunteered in good faith for psychiatric treatment. Id. at 476.

This court agreed, construing RCW 71.05.230(2) "as requiring the trial court to make a specific determination that a potential detainee has not in good faith volunteered for appropriate treatment before ordering involuntary treatment." Id. at 477. But we also held that "this burden on the State arises only where the potential detainee has put his or her status as a good faith voluntary patient at issue." Id. at 478.

Chorney does not guide our interpretation of RCW 71.05.590 because RCW 71.05.230 unequivocally provides that an initial petition for involuntary commitment "may only be filed if the following conditions are met." The conditions listed include notice to the respondent of the need for psychiatric treatment and evidence that the respondent would not in good faith voluntarily participate in that treatment. RCW 71.05.230(2). Unlike RCW 71.05.230(2), the statute at issue here does not make compliance with any procedure a precondition to initiating a revocation petition.

The language of RCW 71.05.590(4)(d) similarly supports the conclusion that the legislature did not intend to require the trial court to evaluate the adequacy of a DCR's pre-petition decision-making process. At the revocation proceeding,

> the issues for the court to determine are whether: (i) The person adhered to the terms and conditions of the court order; (ii) substantial deterioration in the person's functioning has occurred; (iii) there is evidence of substantial decompensation with a reasonable probability that the decompensation can be reversed by further inpatient treatment; or (iv) there is a likelihood of serious harm; and,

if any of the above conditions apply, whether the court should reinstate or modify the person's less restrictive alternative or conditional release order or order the person's detention for inpatient treatment.

RCW 71.05.590(4)(d) (emphasis added). There is nothing in this provision requiring the trial court to determine that a DCR complied with RCW 71.05.590(2) or (5) before filing the revocation petition.

Even were we to interpret RCW 71.05.590(2) and (5) as imposing conditions precedent on a DCR who initiates a revocation proceeding, L.H.'s claim would still fail under Chorney because the holding in that case was premised on the fact that Chorney had argued below that he was a good faith voluntary patient. Chorney, 64 Wn. App. at 478. Here, L.H. did not argue below that the DCR's actions lacked a flexible range of responses or that the DCR failed to consider all reasonably available information, as required by RCW 71.05.590(2) and (5). Without notice of this contention, the State had no opportunity to present evidence to support the DCR's decision-making process. Our review of the record indicates that the DCR who filed the revocation petition, Dawn Egan, met with L.H. at his apartment on November 4 to evaluate his psychiatric condition. Egan obtained a declaration from Gresham, L.H.'s case manager, who detailed the history of his decompensation and his inability to engage in therapy because of his decompensation. Another DCR, Wanda Wright, interviewed L.H.'s sister to document his loss of cognitive functioning and actions he was taking that jeopardized his housing and finances. The record also demonstrates L.H. had been party to several prior petitions to revoke LROs and at least two petitions for 180 days of involuntary treatment. The DCR's decision to seek a revocation was

amply documented here and L.H. fails to identify any specific piece of reasonably available information the DCR failed to consider or any action the DCR should have taken in lieu of revocation.

Finally, L.H. argues that, in granting the petition, the trial court failed to consider mandatory factors set out in RCW 71.05.245. The record does not support this argument.

RCW 71.05.590(5) provides that the court, when considering a revocation petition, must consider factors specified in RCW 71.05.245 "as they apply to the question of whether to enforce, modify, or revoke a court order for involuntary treatment." RCW 71.05.245 instructs the court to "consider the symptoms and behavior of the respondent in light of all available evidence concerning the respondent's historical behavior," including symptoms of severe deterioration, violent acts, and marked and concerning changes in baseline behavior, and whether, without treatment, continued deterioration is probable.

The record indicates that the trial court thoroughly considered L.H.'s symptoms of deterioration, the changes in his baseline behavior, his history of involuntary and voluntary hospitalizations, and the positive effect another hospital stay would likely have on L.H.'s decompensation. Dr. Singer recounted L.H.'s history of four prior ITA hospitalizations, two prior LRO revocations, and three voluntary hospitalizations. Gresham testified L.H. had been previously hospitalized at both Navos and Cascade Behavioral Health, after which L.H. had stabilized and was able to engage in therapy. She also recounted how L.H.'s condition had recently worsened due to his substance abuse and inability or

unwillingness to take his medication regularly when receiving outpatient treatment. The court found these witnesses credible and their testimony compelling, and relied on this evidence in making its decision. The record does not support L.H.'s contention that the trial court failed to consider the factors set out in RCW 71.05.245.

L.H. cites In re Dependency of A.M.M., 182 Wn. App. 776, 789, 332 P.3d 500 (2014), to support his argument that reversal is required when a trial court fails to make statutorily required findings. In that case, A.M.M.'s incarcerated father appealed the termination of his parental rights, arguing that the trial court failed to consider the six enumerated factors for assessing whether an incarcerated parent maintains a meaningful role in his child's life under RCW 13.34.180(1)(f),[4] which was amended and went into effect just days before the court's order. Id. at 784, 786-87. Because the State offered no evidence regarding the statutory considerations and the trial court's order made no mention of them, this court concluded the State failed to satisfy its burden of proof and the trial court failed make a statutorily required finding of fact. Id. at 787.

But unlike A.M.M., the trial court's findings here demonstrate it considered the factors set out in RCW 71.05.245. And, unlike A.M.M., the trial court made all statutorily required findings of fact. It found by clear, cogent, and convincing

---

[4] Before a court terminates the parental rights of an incarcerated parent, the court must consider "whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b) . . ." RCW 13.34.180(1)(f). The factors set out in RCW 13.34.145(5)(b) included whether the parent communicated with the child through letters, calls, or visits, whether the parent made efforts to communicate and work with the Department of Social and Health Services, whether the parent responded positively to reasonable efforts made by the Department, whether there were limitations on the parent's access to services and visitation, and whether the parent's continued involvement in the child's life was in the child's best interest.

evidence that L.H. entered into an LRO on October 18, 2019 and violated the terms of that order by failing to take his medications as prescribed and by failing to refrain from using marijuana. It also found that the State had established L.H. had experienced a substantial decompensation which would be reversed by further inpatient treatment. On this basis, the court concluded that maintaining or modifying the existing LRO was not in L.H.'s best interests and revocation was appropriate. The trial court considered all mandatory factors under RCW 71.05.590 and RCW 71.05.245 and made all statutorily required findings before revoking L.H.'s LRO.

Affirmed.

Andrus, A.C.J.

WE CONCUR:

Brennan, J.                    Dwyer, J.