IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Detention of: | ) | No. 81518-1-I |
| | ) | |
| B.M. | ) | DIVISION ONE |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| _____ | ) | |

ANDRUS, A.C.J. — B.M. challenges the trial court's order revoking her less restrictive treatment under the Involuntary Treatment Act[1] (ITA). B.M. contends that both the State and the trial court failed to comply with the procedural requirements of the ITA. We disagree and affirm the revocation.

## FACTS

B.M. is a 22-year-old woman who suffers from schizoaffective disorder. On November 22, 2019, B.M. stipulated to the entry of a less restrictive treatment order (LRO) for a period of 180 days. Among other conditions of the LRO, the court ordered B.M. to take her prescribed medications, refrain from using non-prescription drugs or alcohol, and refrain from threats or acts of harm to self and others.[2]

---

[1] Chapter 71.05 RCW.
[2] On December 27, 2019, the trial court amended the order to reflect a change in service provider, but left all other conditions intact.

On April 21, 2020, a designated crisis responder (DCR) filed a petition to revoke the LRO. The revocation petition alleged that B.M. had violated the conditions of the LRO and was demonstrating a substantial deterioration of functioning, and that there was a reasonable probability that the decompensation could be reversed by further inpatient treatment. The petition further alleged that she posed a likelihood of serious harm.[3]

On April 27, 2020, the trial court held a hearing on the revocation petition. B.M.'s stepmother, April Metcalf, testified that B.M. had been released from Smokey Point Behavioral Hospital on April 17 and was homeless at the time of her release. She explained that after B.M. was released, Metcalf helped B.M. pick up her medications before sending her off on a bus to stay with a friend. In the first few hours following her release, B.M. appeared to be relatively stable. According to Metcalf, however, B.M. got sidetracked on the way to her friend's house and ended up staying in a hotel with strangers she had just met. During that weekend, B.M. reportedly sold her phone to buy drugs, broke into a house for the night, and used unspecified drugs.

A DCR detained B.M. at Swedish Medical Center on April 20, 2020, and transferred her to Cascade Behavioral Health the following day. Erica Williams, a licensed independent clinical social worker and records custodian for Swedish Medical Center, testified that, according to chart notes, B.M. tested positive for amphetamines and tetrahydocannabinal (THC). Williams reported that, while

---

[3] At the revocation hearing, the State chose to proceed on only two of the alleged revocation grounds: that B.M. had violated the conditions of the LRO and that her functioning had substantially deteriorated.

hospitalized, B.M. had multiple verbal outbursts, became increasingly agitated, and had to be restrained.

Clare Coetzer, a licensed independent clinical social worker at Cascade Behavioral Health, also testified at the hearing. Coetzer reported that she had reviewed B.M.'s medical chart, had consulted with B.M.'s treatment team and had personally evaluated B.M. She testified that B.M. was consistently agitated, irritable, and disruptive while at the hospital and indicated that B.M. had admitted to methamphetamine use. Coetzer further reported that on April 25, 2020, B.M. punched and kicked an elevator in the facility and, when nurses attempted to stop her, threatened, "I will punch you if you talk to me."

Coetzer explained that, during her evaluation, B.M. had promised to continue taking her medications when released from the hospital but that B.M. was unable to report who her doctor was or where she goes to acquire her medications.

The court found the testimony of Metcalf, Williams, and Coetzer to be credible.

B.M. also testified at the hearing. She admitted to smoking marijuana but denied that she smoked meth or that she threatened the hospital staff. The court observed that B.M.'s mood during the hearing "appeared to be highly labile and her emotions have appeared to be highly dysregulated" and noted that this behavior appeared to be evidence of ongoing symptomology. Finding that B.M.'s testimony was colored by this ongoing symptomology, the court gave it less weight than the other testimony.

At the conclusion of the hearing, the court found there was insufficient evidence to demonstrate that B.M. had substantially deteriorated, but found that B.M. had violated the conditions of the LRO by "failing to refrain from the use of non-prescribed drugs and failing to refrain from acts, attempts, and threats of harm." The trial court further found that releasing B.M. on an LRO was not in the best interests of either B.M. or the community because B.M. had not yet stabilized. The court revoked the LRO and ordered B.M. to be hospitalized for the remainder of the original 180 days.

On April 28, 2020, B.M. filed a motion to reconsider the court's decision to revoke, which the trial court denied. B.M. appeals.[4]

ANALYSIS

B.M. contends that the DCR and the trial court failed to comply with mandatory procedural requirements for revoking an LRO under former RCW 71.05.590 (2019).[5] We disagree.

Under RCW 71.05.590(1), a DCR may take action to enforce, modify, or revoke an LRO if the DCR first determines that (1) the individual subject to the LRO is failing to adhere to the terms and conditions of the order; (2) the individual has experienced a substantial deterioration in functioning; (3) there is evidence of "substantial decompensation with a reasonable probability that the

---

[4] The record indicates that B.M. subsequently agreed to the entry of a new 180-day LRO on May 8, 2020. The State petitioned to revoke this LRO on May 18, 2020. After another hearing on June 10, 2020, the court once again revoked this LRO. This subsequent proceeding and revocation order are not a part of this appeal.

[5] Several provisions of RCW 71.05.590 were amended in 2020. LAWS OF 2020, ch. 302, § 54. These amendments do not affect our analysis. The reference to statutes in this opinion are to the version in effect at the time of B.M.'s revocation proceeding.

- 4 -

decompensation can be reversed by further evaluation, intervention, or treatment; or (4) the individual poses a likelihood of serious harm. RCW 71.05.590(1)(a)-(d).

RCW 71.05.590(5) dictates that the DCR "must consider the factors specified under RCW 71.05.212," which includes "all reasonably available information from credible witnesses and records" regarding prior recommended civil commitments, the individual's historical behavior, prior findings of incompetency, and prior commitments under the ITA. RCW 71.05.590(5); former RCW 71.05.212(1)(a)-(d) (2018).[6]

Under RCW 71.05.590(2), any action the DCR takes in response to such events "must include a flexible range of responses of varying levels of intensity appropriate to the circumstances and consistent with the interests of the individual and the public in personal autonomy, safety, recovery, and compliance." The statute provides a nonexhaustive list of available actions, which include counseling and offering incentives to motivate compliance, increasing the intensity of outpatient services, requesting modification of the LRO, temporarily detaining the individual for evaluation, or initiating revocation procedures. RCW 71.05.590(2)(a)-(e).

If the DCR elects to seek a revocation of the LRO, a hearing must be held to determine whether the person should be detained. At the hearing, the trial court determines whether any of the four grounds in RCW 71.05.590(1) have been proven by clear, cogent, and convincing evidence, and if so, "whether the court should reinstate or modify the [LRO] or order the person's detention for inpatient

---

[6] RCW 71.05.212 was amended in 2020 to account for culturally appropriate evaluations. LAWS OF 2020, ch. 256, § 305 (effective June 11, 2020). This change does not affect our analysis.

treatment." RCW 71.05.590(4)(d); MPR 4.5(a). In making this decision, the trial court "must consider the factors specified under RCW 71.05.245," including "symptoms and behavior of the respondent in light of all available evidence concerning the respondent's historical behavior." RCW 71.05.590(5); RCW 71.05.245(1).

B.M. argues that these statutory provisions are mandatory and the State presented no evidence that these requirements were satisfied. Specifically, she contends there is no evidence that the DCR who filed the revocation petition considered relevant information from credible witnesses and records or that either the DCR or the court considered a flexible range of responses before revoking B.M.'s LRO. We reject B.M.'s argument because the statutory language of RCW 71.05.590 does not support it.

Statutory construction is a question of law this court reviews de novo, giving effect to the plain and ordinary meaning of the statute's language. In re Det. of R.H., 178 Wn. App. 941, 948, 316 P.3d 535 (2014). "As civil commitment statutes authorize a significant deprivation of liberty, they must be strictly construed." Id. (quoting In re Det. of J.R., 80 Wn. App. 947, 956, 912 P.2d 1062 (1996)). But we will not import requirements into the ITA when the plain language of the statute demonstrates no legislative intent to impose such requirements. See In re Det. of S.B., 7 Wn. App. 2d 337, 340-41, 433 P.3d 526 (2019) (rejecting contention that requirement in RCW 71.05.280(3) that court find patient was not a voluntary good faith patient as condition of initial 14-day commitment applied to petition for 180 days of additional commitment under RCW 71.05.280(4)).

Here, the plain language of RCW 71.05.590(1), (2), and (5) demonstrates that a DCR's decision to revoke an LRO is conditioned only on the determination that one of four events has occurred: the respondent has failed to adhere to the LRO, the respondent's functioning has substantially deteriorated, the respondent has experienced a substantial decompensation which could be reversed by further treatment, or the respondent poses a likelihood of serious harm. Once a DCR determines that one of these events has occurred, the DCR has discretion to take action, including seeking revocation of the LRO, that is "appropriate to the circumstances and consistent with the interests of the individual and the public in personal autonomy, safety, recovery, and compliance." RCW 71.05.590(2). There is nothing in this statute to demonstrate an intent to mandate a specific process for deciding which action is the most appropriate or an intent to make compliance with such a process a pre-condition to taking any of the authorized actions.

Moreover, the plain language of RCW 71.05.590(4) supports this conclusion. That statute indicates that when a DCR petitions for revocation of an LRO, the court will conduct a hearing on the matter. At that hearing

> the issues for the court to determine are whether: (i) The person adhered to the terms and conditions of the court order; (ii) substantial deterioration in the person's functioning has occurred; (iii) there is evidence of substantial decompensation with a reasonable probability that the decompensation can be reversed by further inpatient treatment; or (iv) there is a likelihood of serious harm; and, if any of the above conditions apply, whether the court should reinstate or modify the person's less restrictive alternative or conditional release order or order the person's detention for inpatient treatment.

RCW 71.05.590(4) (emphasis added). Nothing in this language supports the contention that the DCR was required to engage in a specific process or that the

court was required to evaluate and make findings regarding the adequacy of a DCR's pre-petition decision-making process.

B.M. relies on In re Chorney, 64 Wn. App. 469, 825 P.2d 330 (1992) for the proposition that the State was required to present evidence that the DCR complied with these statutory provisions and that the trial court should have made related findings before granting the revocation. However, Chorney is distinct from this case.

In that case, Chorney voluntarily sought psychiatric treatment to manage his issues coping with stress and controlling his anger. 64 Wn. App. at 471. Chorney then objected to treatment and became so hostile and suicidal that he was placed in restraints. Id. at 471-73. Based on this behavior, the hospital petitioned for Chorney to be involuntarily detained, which the trial court granted. Id. at 473. On appeal, Chorney argued the trial court erred when it failed to make a determination whether he had volunteered in good faith for psychiatric treatment, within the meaning of RCW 71.05.230(2). Id. at 476. This court agreed with Chorney and noted that, even though there is no express requirement in the statute, a trial court must "make a specific determination that a potential detainee has not in good faith volunteered for appropriate treatment before ordering involuntary treatment." Id, at 477. This requirement, however, arises only where the potential detainee raises the issue of their status as a good faith voluntary patient. Id. at 478.

Chorney is distinguishable because the statute at issue in that case, former RCW 71.05.230 (1987), contains express language making the patient's

voluntariness a condition precedent to filing a petition for involuntary treatment. Former RCW 71.05.230 explicitly says "[a] petition may only be filed if the following conditions are met: . . . (2) The person has been advised of the need for voluntary treatment and the professional staff of the facility has evidence that he or she has not in good faith volunteered." No comparable language can be found in RCW 71.05.590. Because the provisions here are not mandatory prerequisites for either filing or granting a revocation petition, there is no basis to suggest the State was required to present related evidence or that the court was required to make specific findings at the revocation hearing.

Even assuming that the State was required to prove that it considered the factors specified under RCW 71.05.212 and a flexible range of responses, B.M.'s claims still fail under Chorney. There, this court held that the burden on the State to prove that a potential detainee had not volunteered in good faith arises only where the potential detainee raises the issue. Chorney, 64 Wn. App. at 477-78. Here, B.M. did not raise the issue of the DCR's compliance with RCW 71.05.590(2) or (5) below and the State had no opportunity to present evidence demonstrating it had complied.

Finally, B.M. argues that the trial court violated RCW 71.05.590(5) and RCW 71.05.245 by failing to consider B.M.'s symptoms and behavior in light of her historical behavior. We also disagree with this argument.

Under RCW 71.05.590(5), the trial court "must consider the factors specified under RCW 71.05.245," including "symptoms and behavior of the respondent in light of all available evidence concerning the respondent's historical behavior," in

determining whether to enforce, modify, or revoke an LRO. RCW 71.05.590(5); RCW 71.05.245(1).

The record demonstrates that the trial court did consider these factors in deciding to revoke the LRO. B.M. agreed to the entry of a 180-day LRO on November 22, 2019. B.M.'s stepmother testified that B.M. had been hospitalized in early April 2020 and began to exhibit symptoms almost immediately upon her discharge. She also explained that B.M. was not at her baseline at the time of the April 27 hearing and that, historically, B.M. was only at baseline when she was in the hospital and consistently taking her medications. She stated that when B.M. stops taking her medications, her functioning deteriorates and she becomes disinclined to abide by the conditions of the LRO. Throughout the hearing, B.M. interrupted the proceedings on multiple occasions and, at one point, shouted "I don't give a f[---] about the LR." The court even noted that B.M.'s behavior during the hearing "appear[ed] to also be evidence of ongoing symptomology." There is no basis for the contention that the trial court failed to consider factors under RCW 71.05.245 when it rendered its ruling.

Finally, B.M. contends In re Dependency of A.M.M., 182 Wn. App. 776, 789, 332 P.3d 500 (2014) requires reversal in this case. In that case, Mares, the incarcerated father of three young children, appealed the termination of his parental rights, arguing the trial court failed to make statutorily required findings. Id. at 784-87. Shortly before the court terminated his parental rights, the legislature amended RCW 13.34.180(1)(f) to require consideration of certain enumerated factors for assessing whether an incarcerated parent had maintained a meaningful

role in his child's life.  Id. at 786-88.  This court reversed the termination order because the State failed to offer any evidence regarding these statutory factors and the trial court failed to make statutorily required findings of fact.  Id. at 787.

Unlike A.M.M., the statute at issue here does not mandate that the court make explicit factual findings regarding a respondent's symptoms or behavior.  The record shows the trial court made all the factual findings it was required to make under RCW 71.05.590(4)(d).  The court found by clear, cogent, and convincing evidence that B.M. had violated the terms and conditions of the November 22, 2019 LRO by failing to refrain from the use of non-prescribed drugs.  It further found that reinstating the LRO was inappropriate and not in the best interests of B.M. or the community because she had not yet stabilized.  The record supports these findings.

We therefore affirm.

_Andrus, A.C.J._

WE CONCUR:

_Mann, C.J._          _Dwyer, J._