FILED
4/12/2021
Court of Appeals
Division I
State of Washington

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| In the Matter of the Detention of: | No. 81209-2-I |
| J.S., | DIVISION ONE |
| Appellant. | UNPUBLISHED OPINION |

ANDRUS, J. — J.S. challenges a trial court's order involuntarily committing him for 14 days of mental health treatment. J.S. contends that the written findings of fact entered at the conclusion of the commitment hearing are not sufficiently specific to permit appellate review, and that the supplemental findings entered after the notice of appeal was filed should be stricken from the record. J.S. further contends that insufficient evidence supports the trial court's conclusions that he was gravely disabled and not a good faith voluntary patient. He also maintains he was deprived of his right to trial by jury on the 14-day commitment petition. We affirm.

<u>FACTS</u>

On February 8, 2020, Designated Crisis Responder (DCR) David Cascella filed a petition for an initial 72-hour detention of J.S., a 31-year-old man from Whatcom County with a history of multiple psychiatric hospitalizations and a previous diagnosis of bipolar disorder. Cascella sought to detain J.S. because, while staying with his mother, he presented to the emergency room with multiple self-inflicted stab wounds. Cascella

Citations and pin cites are based on the Westlaw online version of the cited material.

deemed J.S. an imminent risk of harm to himself and gravely disabled because of his mental health disorder. J.S. was placed on a 72-hour initial detention while he continued to recover in the intensive care unit of the PeaceHealth St. Joseph Medical Center (PeaceHealth).

On February 10, 2020, PeaceHealth filed a petition pursuant to Chapter 71.05 RCW seeking to involuntarily commit J.S. for a period of up to 14 days for evaluation and treatment. On February 11, 2020, a court commissioner held a probable cause hearing on the petition. The State presented the testimony of J.S.'s mother, Maude Anderson; DCR Cascella; and PeaceHealth licensed psychologist, Dr. Nate Reece.

Anderson testified that J.S. came to stay with her in January 2020, about three weeks before he was detained. She knew J.S. had become homeless and his mental state seemed "vulnerable and tenuous," so she allowed him to stay with her to get some rest. After that, J.S.'s mental state "went . . . downhill . . . rapidly." Anderson encouraged J.S. to obtain voluntary mental health treatment, but he refused. The day before J.S. was hospitalized, he drove by himself to Seattle in a confused state and called Anderson to pick him up because he had no money, no gas, and was hearing voices.

On the morning of February 6, 2020, J.S. told his mother he needed to see a doctor. While she was getting dressed to leave, she heard her dog "shrieking." She saw that J.S. "had the dog pinned down with a wrestling hold with blood squirting out of her neck and a boning knife in the other hand." She called 911 for J.S. and took the dog to a veterinary hospital. When she returned home, Anderson found that J.S. had spread blood and feces around the room. Anderson subsequently learned from police that J.S. had stabbed himself multiple times and been taken by police to the emergency department.

Cascella testified he was called to evaluate J.S. based on the concern that J.S. had stabbed both himself and his mother's dog. J.S. was "paranoid, guarded, and evasive of any questions" about his mental health during his first interview. Cascella said that J.S. minimized the significance of his situation and insisted his mother was a liar. During a second interview, J.S. admitted he had stabbed himself because he had ordered a "zygote, which he identified to be in all living things to be terminated." When Cascella asked J.S. why he had stabbed the dog, J.S. became "evasive and guarded" and denied that he ever said anything about zygotes or about stabbing himself.

Dr. Reece evaluated J.S. while still in the hospital's ICU. Dr. Reece opined that J.S. was "gravely disabled" as a result of his untreated mental disorder. Dr. Reece noted that J.S. had demanded to leave the hospital despite having multiple IVs and a chest tube in place and that, to the best of his knowledge, J.S. had shown no inclination to remain hospitalized voluntarily. Dr. Reece further opined that he did not believe any less restrictive alternative than hospitalization was in the best interest of J.S. or others.

J.S. also testified at the hearing. He acknowledged that he had expressed his desire to be released from the hospital, but denied that he had ever demanded to be released. He testified he would remain in the hospital voluntarily if necessary to maintain his Second Amendment right to bear firearms. However, when asked whether he would stay in the hospital as long as the doctors thought he should, he said "No. Because the doctors are biased because they work for the hospital where she gets money from their patients, so no."

At the conclusion of the evidence, the commissioner found that as a result of a mental disorder, J.S. was in danger of serious physical harm resulting from the failure to

3

provide for his essential human needs of health or safety. The commissioner also found that J.S. was not a good faith voluntary patient.

On February 11, 2020, the day of the hearing, the commissioner used a boilerplate form to enter findings of fact, conclusions of law, and an order committing J.S. to up to 14 days of involuntary treatment. On February 19, 2020, J.S., through counsel, timely filed a motion to revise the commissioner's ruling.

On March 6, 2020, before his motion to revise was decided, counsel for J.S. filed a notice of appeal in this court.

On March 9, 2020, the State submitted a set of proposed supplemental findings of fact to the commissioner, noted the proposed findings for consideration by the commissioner on March 20, and served a copy of this notice on counsel for J.S. The commissioner signed these supplemental findings on March 20, 2020. J.S.'s attorney approved the entry of these findings.

On June 5, 2020, the superior court entered an agreed order dismissing the motion to revise the commissioner's order.

ANALYSIS

A. Supplemental Findings of Fact

J.S. moves to strike the March 20 supplemental findings of fact and contends that the 14-day order of commitment must be vacated because the boilerplate findings entered at the conclusion of the hearing are not sufficiently specific to permit appellate review.

Findings of fact are required following an involuntary commitment hearing. MPR 3.4(b). A superior court's written findings of fact "should at least be sufficient to indicate the factual bases for the ultimate conclusions." In re Det. of LaBelle, 107 Wn.2d 196,

218, 728 P.2d 138 (1986). The purpose of this requirement is to ensure that the trial court has properly addressed all issues and that the parties and the appellate court are fully informed of the basis of the decision. Id. Boilerplate findings, without more, are insufficient to permit meaningful appellate review of a trial court's involuntary commitment order. In re Det. of G.D., 11 Wn. App. 2d 67, 70, 450 P.3d 668 (2019).

J.S. first argues we cannot rely on the March 20 supplemental findings because the commissioner entered them in violation of RAP 7.2. Under RAP 7.2(a), "[a]fter review is accepted by the appellate court, the trial court has authority to act in a case only to the extent provided in this rule . . . ." RAP 7.2(e) authorizes the trial court to hear or determine "(1) postjudgment motions authorized by the civil rules, the criminal rules, or statutes, and (2) actions to change or modify a decision that is subject to modification by the court that initially made the decision." However, "[i]f the trial court determination will change a decision then being reviewed by the appellate court, the permission of the appellate court must be obtained prior to the formal entry of the trial court decision." RAP 7.2(e).

J.S. asserts that this court accepted review when he filed his notice of appeal on March 6, 2020. He contends that under RAP 7.2, the trial court lacked authority to substantively alter the record without permission from this court or notice to appellate counsel. The State argues that RAP 7.2 did not restrict the trial court's authority to enter supplemental findings because J.S.'s February 19, 2020 motion to revise the commissioner's ruling pursuant to RCW 2.24.050 rendered his appeal premature. We agree with the State.

In relevant part, RCW 2.24.050 provides:

> All of the acts and proceedings of court commissioners hereunder shall be subject to revision by the superior court. . . . Such revision shall be

upon the records of the case, and the findings of fact and conclusions of law entered by the court commissioner, and unless a demand for revision is made within ten days from the entry of the order or judgment of the court commissioner, the orders and judgments shall be and become the orders and judgments of the superior court, and appellate review thereof may be sought in the same fashion as review of like orders and judgments entered by the judge.

Under the plain and unambiguous language of this statute, when a timely motion to revise a court commissioner's order is filed, the court commissioner's order is not yet final and appealable. RAP 2.2(a)(1) provides that a party may appeal from "[t]he final judgment entered in any action or proceeding." Thus, until the court rules on a pending motion to revise a commissioner ruling or until the party withdraws that motion, an appeal is premature.[1]

Here, J.S.'s motion to revise remained pending when J.S. filed his notice of appeal on March 6, 2020 and when the commissioner entered the supplemental findings on March 20, 2020. Accordingly, J.S.'s appeal had not yet been perfected, and RAP 7.2 did not yet apply.

A premature filing of the notice of appeal is not fatal to J.S.'s claim. A notice of appeal filed after the announcement of a decision but before entry of the final decision is treated as if it had been filed on the day following entry of the decision. RAP 5.2(g); Soper v. Knaflich, 26 Wn. App. 678, 680-81, 613 P.2d 1209 (1980). Here, the decision, including the supplemental findings, became final only when the trial court signed the agreed order dismissing J.S.'s revision motion on June 5, 2020. This court could not have "accepted" J.S.'s appeal before this date.

---

[1] J.S. contends trial courts never have the authority to enter supplemental findings of fact. We note that CR 52(b) states that a party may, within 10 days after entry of a judgment, move the court to amend its findings of fact or make additional findings of fact "and may amend the judgment accordingly."

6

J.S relies on G.D. to support his argument that we cannot consider the March 20 supplemental findings, but that case is readily distinguishable. In G.D., the superior court entered supplemental findings of fact and conclusions of law more than two months after the probable cause hearing and after this court had accepted G.D.'s case for review. 11 Wn. App. 2d at 68-69. In so doing, the court did not provide notice to appellate counsel or seek permission from this court pursuant to RAP 7.2. This court held that the supplemental findings were entered in violation of RAP 7.2 because they were entered without permission of the appellate court after an appeal was properly filed. 11 Wn. App. 2d at 71-72. Although a local county rule provided for entry of supplemental findings and conclusions after the notice of appeal was filed, we determined that this local rule could not circumvent the requirements of RAP 7.2. 11 Wn. App. 2d at 71. Finally, because G.D. had appellate counsel at the time the trial court entered the supplemental findings, we concluded the State's failure to notify appellate counsel prior to the entry of these findings violated principles of basic due process. Id. at 72.

Here, unlike in G.D., J.S. invoked the trial court's jurisdiction by filing a motion to revise the commissioner's ruling before the State and J.S.'s attorney agreed to the entry of supplemental findings. An appealable order did not exist until the trial court either ruled on or dismissed this motion to revise. Thus, the trial court had jurisdiction over the matter at the time the supplemental findings were entered, and there was no need to seek permission from the appellate court pursuant to RAP 7.2.

J.S. next asks us to disregard the supplemental findings because they were entered without notice to appellate counsel. However, the record shows that the proposed supplemental findings were filed on March 9, 2020, more than a week before

7

appellate counsel was appointed on March 17, 2020. There is nothing in the record to show that appellate counsel was not notified of the pending motion to revise or the pending motion for the entry of supplemental findings.

J.S.'s motion to strike the supplemental findings is denied. The record, with the addition of the supplemental findings, was sufficiently specific to permit appellate review.

B. Sufficiency of the Evidence

J.S. next argues that the evidence was insufficient to support the trial court's conclusion that, as a result of a mental disorder, he was gravely disabled under former RCW 71.05.020(22)(a).[2]

Appellate review of the trial court's ruling on involuntary commitment is limited to determining whether substantial evidence supports the findings and, if so, whether those findings support the conclusion of law and judgment. In re Det. of T.C., 11 Wn. App. 2d 51, 450 P.3d 1230 (2019). Substantial evidence is "evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise." In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998) (quoting Holland v. Boeing Co., 90 Wn.2d 384, 390, 583 P.2d 621 (1978). The burden is on the challenging party to demonstrate that substantial evidence does not support a finding of fact. Id. at 162. We do not review credibility determinations. In re Det. of H.N., 188 Wn. App. 744, 763, 355 P.3d 294 (2015).

A court may commit an individual to up to 14 days of involuntary treatment if the State demonstrates by a preponderance of the evidence that, as a result of a mental disorder, the person "presents a likelihood of serious harm, or is gravely disabled."

---

[2] Former RCW 71.05.020(22) was amended in 2020 and recodified as RCW 71.05.020(23). See LAWS OF 2020, ch. 302, § 3. The amendments do not affect our analysis.

Former RCW 71.05.230(1)[3]; H.N., 188 Wn. App. 744 762..  A person is "gravely disabled" if, as the result of a mental disorder, they are "in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety."  Former RCW 71.05.020(22)(a).

To meet its burden of establishing an individual is "gravely disabled," the State must present "recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment."  LaBelle, 107 Wn.2d at 204-05.  The State must also show the failure or inability to provide for essential needs presents "a high probability of serious physical harm within the near future unless adequate treatment is afforded."  Id. at 204-05.

The commissioner found that J.S. suffers from an unspecified psychotic disorder and that as a result, he was in danger of serious physical harm resulting from his failure to provide for his essential needs of health and safety.  It found that J.S. had been hospitalized three times for mental health reasons, that he had historically been resistant to getting help, and according to his mother, he had not been receiving mental health treatment for two years before this hospitalization.  He had become delusional, believing Mossad and the CIA were using computers to take over the world and demanding that his mother unplug all of their electronics.  He slept very little, woke his mother continually, and expressed feelings that he would be "better off dead."  After his admission to the ICU, J.S. explained that he had stabbed himself because a particular kind of "zygote" needed to be terminated.  He had acted out while in the hospital, leading it to call a "code gray" twice due to his behavior.

---

[3] Former RCW 71.05.230(1) was amended in 2020 and recodified as RCW 71.05.240(4)(a).  See LAWS OF 2020, ch. 302, § 36.  The amendments do not affect our analysis.

The evidence amply supports these findings. J.S.'s mother testified that J.S. has a long and difficult mental health history and that his mental health deteriorated rapidly during the three weeks prior to his hospitalization. She explained that J.S. repeatedly refused her efforts to get him to go to the hospital. On the day he finally agreed that he needed a doctor, February 6, 2020, he stabbed himself multiple times, and when admitted to the hospital, was in "very critical medical condition." He had a neck wound requiring sutures. He had two stab wounds to his chest. He had a "pneumothorax"[4] on his left side, a lung laceration, and an abdominal wound. He experienced acute respiratory failure requiring intubation. He was admitted into the hospital's ICU. His treatment team had removed his chest tube the same day as the probable cause hearing, on February 11, 2020. And his medical providers had yet to determine how well J.S.'s lungs were functioning and he remained under close observation.

Dr. Nate Reece, the licensed psychologist who evaluated J.S., testified that, in his opinion, J.S. suffers from a psychotic disorder, and that he is experiencing delusions or command hallucinations causing him to act dangerously and impulsively to the extent where he hurt himself and the family dog. And despite having a chest tube in place, J.S. demanded to leave the hospital. Dr. Reece testified that this impulsive behavior, leading to a near-death situation, and his desire to leave the hospital while in a grave medical condition demonstrated that J.S. was gravely disabled. Both Cascella and Dr. Reece testified that J.S. did not seem to understand the severity of his mental health crisis or his

---

[4] We assume this is a typographical error in the transcript and the witness meant he suffered a "pneumohemothorax," the accumulation of blood and gas in the pleural cavity of the lungs. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1746 (2002).

physical injuries and that he repeatedly asked to leave the hospital against medical advice while still recovering in the intensive care unit from his self-inflicted wounds.

J.S. notes that the State did not allege he posed a likelihood of serious harm to himself, the alternative ground for involuntary commitment under RCW 71.05.240(4)(a), even though the evidence arguably would have established that allegation. In LaBelle, the court stated that to prove grave disability, the danger of harm need not be "evidenced by recent, overt acts." Id. at 204. Instead, the risk of harm "usually arises from passive behavior," such as when a person falls or is unable to "provide for his or her essential needs." Id. But nothing in LaBelle indicates that a recent overt act of self-harm cannot also serve as proof for an allegation that an individual is gravely disabled because his inability to provide for essential needs presents "a high probability of serious physical harm within the near future unless adequate treatment is afforded." Id. at 204-05.

J.S. also argues that the evidence was insufficient to support the trial court's conclusion that he was not a good faith voluntary patient. We disagree.

> Where a potential detainee has put her status as a good faith voluntary patient at issue, the burden is on the State to show by a preponderance of the evidence that the patient has not in good faith volunteered for appropriate treatment before involuntary treatment may be ordered.

In re Detention of Kirby, 65 Wn. App. 862, 870-71, 829 P.2d 1139 (1992). A person qualifies as a good faith voluntary patient if he or she expresses willingness to comply with the prescribed plan of treatment and does not have a history that belies such an expression of willingness. In re Det. of Chorney, 64 Wn. App. 469, 478-79, 825 P.2d 330 (1992).

Here, substantial evidence established that J.S. was not a good faith voluntary patient. J.S.'s mother testified that, prior to the stabbing incident, he resisted her attempts

11

to get him to the hospital for treatment. While still in the intensive care unit, J.S. expressed his desire to leave and was evasive and dismissive when speaking to hospital staff. At the hearing, he initially testified that he would remain in the hospital voluntarily if he could retain his constitutional right to bear firearms. However, he refused to agree to remain in the hospital as long as his doctors thought he should because he thought they were biased. And he did not indicate that he would voluntarily seek treatment if he were to be released.

J.S. analogizes his case to Kirby, but that case is distinguishable. In Kirby, the State "offered the petition for 14-day involuntary treatment . . . [which stated] Kirby was not a good faith voluntary patient merely [because] she . . . is too impulsive." 65 Wn. App. at 869-70. The State also "relied on the testimony of an emergency room social worker . . . that Kirby stated she took an overdose because of thoughts of having to kill a child, and that Kirby had vacillated about taking her medication and coming to the hospital." Id. at 870. The Kirby court determined that although the evidence "certainly justifies a conclusion Kirby was ill, we fail to see how any of it relates to the question of whether she could be considered a good faith voluntary patient." Id. The court reasoned that Kirby voluntarily sought mental health treatment initially, and that "the record from the . . . hearing contains repeated lucid and rational assurances by Kirby that if released she would see her psychiatrist, follow his advice . . . and contact her doctor . . . if she sensed a recurrence of mental disturbances." Id.

In contrast, J.B. repeatedly expressed his desire to leave the hospital despite his serious medical condition and did not indicate that he would continue mental health treatment if released. Although he indicated that he did not want to lose his firearm rights,

12

he nevertheless refused to agree to remain in the hospital as long as his doctors thought necessary. The evidence was sufficient to support a finding that J.S. was not a good faith voluntary patient.

C. Right to Trial by Jury

J.S. argues that the statutes and court rules pertaining to 14-day commitment proceedings unconstitutionally deprive detainees of their constitutional right to a trial by jury. However, in In re the Detention of S.E., 199 Wn. App. 609, 400 P.3d 1271 (2017), this court thoroughly analyzed the history of the right to a jury trial in this state and rejected the proposition that such a right exists for 14-day commitment proceedings. J.S.'s case is not distinguishable from S.E.

J.S. argues S.E. was wrongly decided. In particular, he relies on In re Detention of Ellern, 23 Wn.2d 219, 160 P.2d 639 (1945) in support of his assertion that this right existed at the time of the adoption of the state constitution. But this court recently rejected the same argument in T.C., 11 Wn. App. at 59-60. As the T.C. court recognized, Ellern is readily distinguishable because it involved an individual who had been detained for five months and was facing indefinite involuntary commitment. T.C. at 60.

Moreover, as the T.C. court noted, Washington courts have recently held that there is no state constitutional right to a jury trial in proceedings seeking longer terms of involuntary commitment. See In re Det. of C.B., 9 Wn. App. 2d 179, 183, 443 P.3d 811 (2019) (90-day involuntary commitment proceedings); In re Det. of M.W., 185 Wn.2d 633, 663, 374 P.3d 1123 (2016) (180-day recommitment hearing after dismissal of felony charges based on a finding that defendant was not competent to stand trial). We are not

13

persuaded that we should depart from our well-established precedent that no right to jury trial exists for 14-day commitment proceedings.

Affirmed.

WE CONCUR:

Andrus, A.C.J.

Bowman, J.

Dwyer, J.