IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Detention of | ) | |
| | ) | No. 39489-1-III |
| K.P. | ) | |
| | ) | |
| | ) | PUBLISHED OPINION |

STAAB, A.C.J. — K.P. appeals the trial court's order authorizing a 180-day involuntary commitment. Although the appeal is moot, we exercise our discretion to address the issues. K.P. assigns error to several of the trial court's findings of fact along with its conclusion that K.P. remains gravely disabled. Under this criterion, the State must prove that K.P.'s illness prevents her from providing for her own basic needs. The harm contemplated from being gravely disabled is different from the danger presented by a person who is likely to physically harm themselves or others. K.P. argues that the State and the trial court conflated the different criteria and the evidence fails to prove that she is gravely disabled.

While we agree that the State and the trial court focused some attention on whether K.P. presented a danger of harm to herself or others, we conclude that substantial evidence supports the trial court's findings that K.P.'s mental illness prevents her from providing for her basic needs and that she is gravely disabled. We therefore affirm.

No. 39489-1-III
*In re Detention of K.P.*

BACKGROUND

K.P. has a history of involuntary commitments. Following her most recent two-year commitment, K.P. was discharged on a less-restrictive alternative (LRA) to independent living in a hotel. Within days of this discharge, K.P. stopped taking her medications, missed her treatment appointment, and requested an ambulance because she was having trouble breathing. When paramedics arrived, K.P. would not answer questions and became aggressive. Shortly after K.P. was admitted to the hospital, the superior court granted a petition to revoke K.P.'s LRA. K.P. was transferred to Eastern State Hospital (ESH) in August 2022 for her 22nd admission. A few months later, ESH filed a petition for 180 days of further involuntary treatment, alleging that K.P. was gravely disabled.[1]

At the hearing on the petition, Dr. Brian Sweatt, K.P.'s treating psychiatrist, testified about K.P.'s history of admissions, her diagnosis, treatment, prognosis, and her behavior. He indicated that K.P.'s most recent discharge from ESH was to a hotel. Within three or four days, she became paranoid and was taken from the hotel and admitted back to the hospital.

Dr. Sweatt diagnosed K.P. with schizoaffective disorder, bipolar type that is treatment resistant, meaning K.P. has "tried at least two antipsychotic meds and has failed

_____

[1] There was also a petition to administer involuntary medication that is not at issue in this appeal.

2

to gain control over her mental health symptoms with those two meds." Rep. of Proc. (RP) at 6. The symptoms of K.P.'s diagnosis include severe mood swings, hallucinations, and aggressive behavior. During her time at ESH, K.P. demonstrated consistent assaultive behavior toward peers and staff. Dr. Sweatt believed that K.P.'s current medication was not effective and needed to be altered. However, when he attempted to speak with K.P. regarding her medication, K.P. stated that she felt her symptoms were under control, indicating a lack of insight into her current symptomology. Dr. Sweatt also expressed concern that K.P. would not be able to meet her health and safety needs outside the hospital. As demonstrated by her last three failed discharges, Dr. Sweatt pointed out that once K.P. leaves the hospital she quickly decompensates, stops taking her medications, and becomes "very guarded, paranoid, and threatening" to people around her. RP at 10. Given her current level of elevated symptomology, Dr. Sweatt indicated concern for K.P.'s ability to maintain lodging and acquire food, water, and warmth. He also expressed concern that K.P. might be a danger to herself or others.

Leslie Miknavich, a psychiatric social worker, also testified at the hearing. Miknavich was part of a team that worked on discharge plans for patients. She explained that they had not worked on K.P.'s discharge because Dr. Sweatt was considering new medication and had indicated that K.P. was not clinically ready for discharge. Miknavich explained that K.P. had been working well with her but that she wanted to see her work with Dr. Sweatt on her medications before Miknavich could sit with K.P. and start

discussing discharge options.  On cross-examination, she explained that K.P. told her she made deposits on apartments or hotels, however, Miknavich testified she had no way to verify this information because she did not have a release of information.

K.P. also testified at the hearing and expressed a desire to be discharged.  She suggested independent living as a temporary option with the goal of reuniting with her significant other, though she acknowledged that they had been separated for ten years. When asked where she would get her medication, she indicated she would "probably go to the nearest pharmacy where they were [ ] trusted," had "the best composition of medications," were "universal across the nation," and could "be accessed with great convenience."  RP at 45-46.  She also indicated that she did not want to take the medications recommended by Dr. Sweatt.  She expressed the "[b]enefit of don't fix it if it ain't broke[n]."  RP at 47.  K.P. testified that she believed she had the perfect dose of medications.  Finally, K.P. suggested that after a 40-year process of taking other prescriptions suggested by a prior doctor, she would eventually not need any of it.

After a hearing on the petition, the trial court found that K.P. was gravely disabled in that she was "in danger of serious physical harm resulting from the failure to provide for his/her essential needs of health or safety."  Clerk's Papers (CP) at 91.  In support of this finding, the court found that K.P. has been admitted 22 times to ESH and was returned to the hospital within days from her last two discharges.  The court went on to find:

When decompensated [K.P.] becomes very paranoid, aggressive and assaultive. She brings law enforcement attention to herself and becomes unable to meet her needs. [K.P.] does not have insight into her mental illness. She has minimal understanding of the necessity of taking her medications. She states she will take them "for a while," but then states she won't need them and would stop taking them. [K.P.] has had assaultive behaviors in the hospital as recently as November 2022 when she tried to kick her doctor and then assaulted staff. She was placed in seclusion. [K.P.] does not have a good plan for her discharge. [K.P.] states she would go to an apartment or hotel, but cannot plan for how she would obtain an apartment or hotel, how she would pay for or how she would get her medications, food, etc. It is clear [K.P.] would not be able to meet her essential human needs in the community if released from the hospital. She is at risk for assaultive behaviors and for being assaulted. [K.P.] has made some progress in the hospital, however is not on the discharge list and has not met her discharge criteria. She requires further inpatient treatment to stabilize her symptoms so that when discharged she does not return to the hospital within days.

CP at 91.

In finding that an LRA was not in her best interest, the court found that K.P. "has not met her discharge criteria," remains assaultive, and the "symptoms of her mental illness are still interfering with her ability to take care of herself in the community and not be assaulted." CP at 92.

Based on these findings, the court concluded that K.P. continues to be gravely disabled and ordered an additional 180-day involuntary commitment.

K.P. appeals the commitment order.

5

No. 39489-1-III
*In re Detention of K.P.*

ANALYSIS

1.  WHETHER THE APPEAL IS MOOT

K.P. contends that, while the commitment order entered in this case had expired in early January 2023, the issue is not moot. She argues the order has enduring effects and therefore review of the issue will provide her with relief. While the issue is technically moot, we exercise our discretion to review the appeal.

A case is considered moot if a court can no longer provide effective relief. *In re Det. of H.N.*, 188 Wn. App. 744, 749, 355 P.3d 294 (2015). Generally, an appellate court will not review a moot case. *Id.* However, this court may review a moot case if it presents "issues of continuing and substantial public interest." *Id.* In making this determination, three factors are determinative: "(1) whether the issue is of a public or private nature; (2) whether an authoritative determination is desirable to provide future guidance to public officers; and (3) whether the issue is likely to recur." *Id.*

A fourth factor courts may consider is the level of genuine adverseness and the quality of advocacy of the issues. *Id.* at 749-50. Finally, courts may consider the likelihood the issue in question will escape review because the facts are short-lived. *Id.* at 750. "'[A]n involuntary commitment order has collateral consequences for future commitment determinations.'" *Id.* (quoting *In re Det. of M.K.*, 168 Wn. App. 621, 622, 279 P.3d 897 (2012)).

6

Here, the issue presented is of a public nature. An authoritative determination by this court will help guide the trial courts in future civil commitment hearings, and the issue is likely to reoccur given K.P.'s history of being committed. Additionally, this is an issue that is likely to evade future review given the short timeframe of involuntary commitment orders when compared to the timeframe for an appeal. Finally, this issue will likely have collateral consequences for K.P. should she face involuntary commitment in the future.

2.  COMMITMENT ORDER

K.P. assigns error to several of the trial court's findings of fact and conclusion of law. She contends that the findings are not supported by substantial evidence and do not support the court's conclusion that she is gravely disabled. We disagree.

An appellate court reviewing a trial court's decision on involuntary commitment considers whether the findings of fact are supported by substantial evidence and if those findings support the court's conclusions of law. *In re Det. of A.F.*, 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021). Substantial evidence is the quantum of evidence "sufficient to persuade a fair-minded person of the truth of the declared premise." *H.N.*, 188 Wn. App. at 762. When considering whether there was sufficient evidence, we review the evidence in a light most favorable to the petitioner. *In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019). Unchallenged findings constitute verities on appeal. *In re Est. of Jones*, 152 Wn.2d 1, 8, 93 P.3d 147 (2004).

No. 39489-1-III
*In re Detention of K.P.*

Following the initial involuntary commitment of a person experiencing mental illness, the State is required to prove certain criteria before the commitment can be continued. Former RCW 71.05.280 (2022).[2] Two of the alternative criteria that can support further commitment include proof that the person has threatened, attempted, or actually inflicted harm upon themselves or another and presents a likelihood of serious

---

[2] The current version of the statute is not materially different from former RCW 71.05.280 (2022), which provided: At the expiration of the fourteen-day period of intensive treatment, a person may be committed for further treatment pursuant to RCW 71.05.320 if:

(1) Such person after having been taken into custody for evaluation and treatment has threatened, attempted, or inflicted: (a) Physical harm upon the person of another or himself or herself, or substantial damage upon the property of another, and (b) as a result of a behavioral health disorder presents a likelihood of serious harm; or

(2) Such person was taken into custody as a result of conduct in which he or she attempted or inflicted physical harm upon the person of another or himself or herself, or substantial damage upon the property of others, and continues to present, as a result of a behavioral health disorder, a likelihood of serious harm; or

(3) Such person has been determined to be incompetent and criminal charges have been dismissed pursuant to RCW 10.77.086(7), and has committed acts constituting a felony, and as a result of a behavioral health disorder, presents a substantial likelihood of repeating similar acts.

(a) In any proceeding pursuant to this subsection it shall not be necessary to show intent, willfulness, or state of mind as an element of the crime;

(b) For any person subject to commitment under this subsection where the charge underlying the finding of incompetence is for a felony classified as violent under RCW 9.94A.030, the court shall determine whether the acts the person committed constitute a violent offense under RCW 9.94A.030; or

(4) Such person is gravely disabled.

8

harm.  Former RCW 71.05.280(1), (2).  These criteria were not alleged in this case.

Instead, the State alleges that K.P. is "gravely disabled" under former RCW 71.05.280(4).

The term "gravely disabled" has alternative definitions.  Former RCW

71.05.020(24)(a), (b) (2022); *In re Det. of LaBelle*, 107 Wn.2d 196, 202, 728 P.2d 138

(1986).  The trial court found that K.P. is gravely disabled under subsection (a), which

requires the State to prove that she "[i]s in danger of serious physical harm resulting from

a failure to provide for his or her essential human needs of health or safety[.]"  Former

RCW 71.05.020(24)(a).  In order to establish that a person is gravely disabled under this

section, "the State must present recent, tangible evidence of failure or inability to provide

for such essential human needs as food, clothing, shelter, and medical treatment which

presents a high probability of serious physical harm within the near future unless

adequate treatment is afforded."  *LaBelle*, 107 Wn.2d at 204-05.  The failure or inability

to provide must stem directly from the mental disorder.  *Id.*

In *LaBelle*, the Supreme Court clarified the difference between the "gravely

disabled" standard and the "harm to others" standard.  Under the "gravely disabled"

standard, "the danger of harm usually arises from passive behavior—i.e., the failure or

inability to provide for one's essential needs."  *Id.* at 204.  On the other hand, danger to

self or others "usually arises from active behavior as evidenced by 'threats or attempts to

commit suicide or inflict physical harm on one's self.'"  *Id.*  (quoting former RCW

71.05.020(3)(a) 1989).

Here, the trial court concluded that K.P. was gravely disabled as defined by former RCW 71.05.020(24)(a) because she was "in danger of serious physical harm resulting from the failure to provide for his/her essential needs of health or safety." CP at 91.

K.P. asserts there was insufficient evidence to support the finding that K.P. "cannot plan for how she would obtain an apartment or hotel, how she would pay for or how she would get her medications, food, etc," and that she would be unable to meet her essential needs in the community if released from the hospital. CP at 91. We disagree and find that substantial evidence supported the court's findings.

As Dr. Sweatt testified, K.P. has been admitted 22 times to ESH. She has a history of quickly decompensating within days of her discharge. More recently, her mental health condition caused her to lose her temporary housing within three to four days of discharge. Moreover, she fails or refused to take her medication and follow through with treatment. This results in an inability to provide for her own essential needs.

K.P. also contends that the trial court's findings do not support its conclusion that K.P. is gravely disabled. She contends that while Dr. Sweatt expressed some concerns about K.P.'s inability to meet her essential needs upon release, his primary concern seemed to be K.P.'s assaultive behavior. She argues that while assaultive behavior may provide the basis for continued commitment under the danger to self or others standard

10

set forth in former RCW 71.05.280(1) or (2), these criteria were not alleged in the State's

petition or proved in this case. In support of her position, K.P. cites *LaBelle*.

In *LaBelle*, after distinguishing between the different criteria, the court then

applied the criteria to the different cases that were consolidated for review. In the

consolidated case of Maurice Marshall, the State's physician testified that Marshall's

mental health condition caused him to react to situations with paranoia and hostility that

resulted in assaultive behavior. The trial court found Marshall gravely disabled because

"Marshall's hostile and reactive behavior placed him in danger of serious physical harm."

*LaBelle*, 107 Wn.2d at 212. The Supreme Court disagreed and held the trial court's

finding that Marshall's behavior placed him in danger of serious physical harm was not

the type of harm contemplated by the "gravely disabled" criteria. *Id.*

We agree with K.P. that the evidence presented at the hearing and the court's

findings repeatedly reference K.P.'s assaultive behavior, both before and after her

detention. Similar to *LaBelle*, these allegations and findings might support commitment

under the danger to self or others standard set forth in former RCW 71.05.280(1) or (2),

but this is not the type of harm contemplated by a person who is gravely disabled under

former RCW 71.05.280(4) and .020(24)(a). Nonetheless, because the trial court's

conclusion did not rest solely on K.P.'s assaultive behavior, but also relied on its findings

11

No. 39489-1-III
*In re Detention of K.P.*


that K.P.'s mental illness prevented her from meeting her essential needs, we determine

that the court applied the correct standard.

     Affirmed.

_____
          Staab, A.C.J.

I CONCUR:

_____
      Cooney, J.

No. 39489-1-III

FEARING, J., (concurrence) — Because the order of commitment could have

continuing adversative impacts on K.P., we disagree with the lead opinion that the appeal

is moot. Otherwise, we concur in the lead opinion.

In *In re Detention of Chorney*, 64 Wn. App. 469, 825 P.2d 330 (1992), Division I

of this court ruled that, despite the appeal's mootness, the court would hear the appeal

from an involuntary commitment order because of the raising of an issue of substantial

public importance. Later, Division One of this court described an appeal of such an order

"technically moot," but determined to hear the appeal because of the raising of an issue of

substantial public importance. *In re Detention of H.N.*, 188 Wn. App. 744, 750, 355 P.3d

294 (2015). Division I, in *In re Detention of H.N.*, also noted the involuntary

commitment order's future adverse ramifications. Division II of this court held that

an involuntary commitment order that has since expired is not moot because of adverse

consequences attended to future involuntary commitment proceedings. *In re Detention of

M.K.*, 168 Wn. App. 621, 279 P.3d 897 (2012).

We agree with Division II's approach in *In re Detention of M.K.* Because of

future adverse consequences to K.P., her appeal is not moot and not even

technically moot. A case lies moot when all questions are merely academic. *Harke v.*

No. 39489-1-III
*In re Detention of K.P.* (concurring)

*Harke*, 29 Wn. App. 2d 866, 543 P.3d 829 (2024). A patient's appeal survives a mootness challenge when an order of involuntary commitment carries a significant collateral consequence. *In re Involuntary Commitment of M.*, 2020 ME 99, 237 A.3d 190, 194-95.

I CONCUR:

_____
Fearing, J.